Leon B. Polsky, J.
On the intended eve of trial the defendant moves for the dismissal of the indictment in the interest of justice and because of a claimed denial of a speedy trial. Underlying this motion is a challenge to the array of prospective jurors and assertions that the entire petit jury panel of Richmond County is hopelessly and irredeemably tainted by methods of jury qualification and selection which are contrary to established constitutional and statutory requirements.
Of considerable importance to the motion to dismiss the indictment — which is the relief sought by the defendant if he prevails on the challenge to the array — is the context in which the issue arises at this late date.
I
The charges in this case, as well as the indictments against others in two related cases, arise out of incidents allegedly occurring in early 1972 while the defendant herein was appearing as the attorney for a police officer charged with an offense in the Richmond County Criminal Court. In August, 1973 the Deputy Attorney-General began presenting evidence to the Grand Jury of the Extraordinary Special and Trial Term of the Supreme Court, Richmond County, concerning alleged efforts by the defendant and others to improperly influence the testimony of certain witnesses in the 1972 Criminal Court case.
On October 24, 1973 the Grand Jury voted to indict Mr. *30 Hasson for bribery of a witness (Penal Law, § 215.00) and two counts of perjury (Penal Law, art 210). An indictment was not signed and filed until April 22, 1974, approximately six months after a true bill had been voted. A variety of pretrial motions, not pertinent here, were made and decided and the case was set down for trial in early February, 1975.
On January 21, 1975 the Supreme Court of the United States held in Taylor v Louisiana (419 US 522) that a statutory procedure whereby women were granted automatic exemption from jury service violated the constitutional right of a defendant to be tried before a jury selected from a fair cross section of the community. The defendant promptly moved before the late Justice Murtagh to dismiss the indictment because of the New York statutory exemption of women from jury service and their consequent underrepresentation on the Grand Jury which voted the indictment. Counsel also challenged the composition of the petit jury venire. By the time the motion was returnable, Justice Titone had already found, in People v Chalpa (Supreme Ct, Richmond County), that: "jury panels assembled in this [Richmond] county within the past four years were comprised of approximately 85% males and 15% female”. He held the New York statutory exemption unconstitutional.
In a brief memorandum Justice Murtagh denied the motion to dismiss the indictment, holding that there was "no proof whatever of a deliberate and intentional exclusion of women from grand jury service.”
After the conclusion of a pretrial "Wade”hearing, extensive discussions were had between counsel and the court in an effort to arrive at a stipulated method of obtaining an array in which women would be fairly represented. Negotiations were unsuccessful and the case was adjourned to await reconstitution of the Richmond County venire or pool of qualified jurors to bring it into compliance with constitutional requirements.
II
During the next 10 months the case appeared on Justice Murtagh’s control calendar in New York County. In January, 1976, as a result of a restructuring of the Extraordinary Term, this case, along with other matters then pending before Justice Murtagh, was assigned to me for trial. Some further delay was occasioned by the death of Justice Murtagh and *31 the reargument before me of certain pretrial motions. In the late spring of 1976, in order to accommodate the trial schedule of the court and both counsel, it was agreed that trial would commence in mid-October — later changed to November 1. Just prior to that date the People requested an adjournment because of the illness of a witness. A hearing was held on the People’s application and an adjournment of trial was denied. During the course of the hearing, defense counsel informed the court that he had become aware that jurors in Richmond County were required to fill out a qualifications questionnaire which contained questions not contained in the form presently approved in section 661 of the Judiciary Law or by joint rule 620.17 (22 NYCRR 620.17) of the First and Second Judicial Departments.* The defense requested a hearing to determine what happened to prospective jurors who gave the "wrong” answer to any of the questions.
In the course of the hearing it became glaringly apparent that the present jury selection process failed to approach constitutionally acceptable standards. The defendant then filed formal papers challenging the array and moved to dismiss the indictment. At the thus-expanded hearing held on the challenge to the array, testimony was given by the County Clerk, by his former deputy who supervised the jury selection process from 1939 through 1975, and by one of the assistant clerks who has participated in the process since 1969. Among the exhibits received in evidence at the hearing were the jury qualification questionnaires and records of service of the 103 persons summoned for jury duty on this case and drawn from the pool of approximately 18,000 qualified jurors. Although this group of 103 persons is the end product of the selection system here challenged, it would help place the issues in focus to at this point summarize the salient characteristics of this venire:
*32 AGE NUMBER YEAR INITIALLY QUALIFIED NUMBER 20-29 2 Pre-1950 7 30-30 16 1951-1955 9 40-49 26 1956-1960 13 50-59 31 1961-1965 12 60-69 26 1966-1970 41 70-75 2 1971-1974 14 1975-1976 7 Prior Service
Including prior Grand Jury service, the average prospective juror had been drawn and summoned for jury duty on 6.9 prior occasions. It should be noted however that on numerous occasions the juror had been excused without actually serving.
Sex
Of the 103 persons in the panel, 16 or 15.5% are female. The mean age of the women on the panel is 60 and the average is between 55 and 56. Of the seven persons qualified as jurors since the Taylor decision, four are female and three male:
III
SELECTION OF THE JURY POOL
The present jury pool of approximately 18,000 qualified jurors was created from an initial group of 8,700 persons qualified in 1939-1940 from the voter enrollment in alternately selected election districts. Thereafter as additional jurors were needed, either to increase the size of the pool or to replace persons who died or moved, further random selections were made from randomly selected election districts. During this period a significant but presently unascertainable number of volunteers, not chosen from voter registration lists, were also added to the pool of qualified jurors.
Sometime in late 1972 or early 1973, the Office of Court Administration supplied the County Clerk with a computer printout of 10,000 randomly selected registered voters. All such voters, at the time, were over the age of 21. This list, in part was used during 1973 and 1974 for the notice by the County Clerk to persons to come in for examination as to their qualifications. The testimony indicates that approximately one third of the persons so summoned responded. *33 Persons found qualified were added to the jury pool along with whatever volunteers had been obtained.
In May of 1975 another list of 10,000 names was obtained from the Office of Court Administration. This list was similar to the earlier list in that it contained a randomly selected group of Richmond County registered voters. However, it also included new registrants over the age of 18. With the list were preprinted mailing labels for each of the 10,000 registrants. In order to summon these people to qualify, all that had to be done was to affix the mailing label to existing postcard type notices and run them through a postage meter. Instead, because of budgetary considerations, it was decided to convert to an entirely voluntary system of obtaining additional jurors to supplement the pool. Articles appearing in the local newspaper and word of mouth generated enough volunteers so that no new jurors have needed to be summoned since the spring of 1975. The evidence indicates that these walk-in volunteers were at least 80% male. There is also testimony, somewhat contradicted, that 500 or 1,000 women, their names obtained from the voter registration list, were summoned during one week in 1975 and those who did not have children under 16 and were otherwise qualified were added to the pool.
IV
In the 21 months following Justice Titone’s decision noting the constitutional imbalance in the Richmond County pool of jurors, and in the 20 months since Justice Murtagh adjourned this trial in anticipation of a reconstitution of the pool of qualified jurors, the County of Richmond has failed to take any meaningful action.
With the exception of one week in 1975 when an effort was made to add women to the panel no attempt was made to correct the impermissible sexual bias in the pre- Taylor pool of qualified jurors. Viewing the conflicting testimony in a manner most favorable to the People, no more than 1,000 women were specially summoned. Assuming none claimed exemption and all were otherwise qualified, the addition of these persons to the existing panel of about 18,000 persons would result in the raising of the proportion of women from 15% up to 20% of the total. This negligible change was accompanied by use of the volunteer system which, according to the clerk in charge, produced additionally qualified jurors at the rate of four or five male volunteers to every female.
*34 V
The challenge to the panel of 103 jurors drawn for this Criminal Term of the Supreme Court is allowed (CPL 270.10). The panel consisting of only 15.5% women was drawn from and reflected a larger group of qualified jurors which failed to represent a fair, cross section of the community.
VI
Having rejected the panel drawn for the term, is there any way that a constitutionally acceptable panel can be drawn from the present roll of approximately 18,000 qualified jurors? One possibility would be to separate the ballots of the male and female jurors and draw 50 jurors of each sex. Such a makeshift procedure, while not comporting with New York statutes, might do as a temporary improvisation to meet constitutional requirements.
I reject this for two reasons. While such improvisation could be justified in dealing with trials occurring shortly after the Taylor decision, there is no reason why almost two years later a court should have to invent an impromptu method of giving a defendant a constitutionally acceptable jury.
More significant perhaps is the fact that the underrepresentation of women on the panel of qualified jurors is only one of many defects in the Richmond County jury qualification process.
Although it has been over two years since persons between the ages of 18 and 21 have been eligible for jury service, no person in that age group has yet been summoned to qualify for jury duty. The first attempt to have such person volunteer was generated by an interview with the County Clerk appearing less than one month ago in the Staten Island Advance.
A further problem lies in noncompliance with subdivision (g) of rule 620.2 (22 NYCRR 620.2 [g]) of the Appellate Division, which provides: "There shall be continuous search for persons qualified and liable for jury service, in order to obtain as many prospective jurors as possible and to limit, as much as possible, repetition of jury service. ” (Emphasis added.)
The records of prior service of the 103 members of the challenged array demonstrate that the procedure of replacement of qualified jurors on an "as-needed” basis has resulted in the creation of a panel of "professional” jurors.
*35 There is no need for me to address the problem of whether —since Taylor — the qualifying of volunteer jurors is permissible. I do think however that serious problems are created by the use of volunteers on the magnitude present here.
In sum, I find the system and procedures for selecting qualified persons for the jury pool precludes the obtaining of a fair cross section of the community as to age and sex, and is further overly imbalanced by persons who have previously served.
I find that the entire petit jury panel of Richmond County is hopelessly and irredeemably tainted by methods of qualification and selection which are contrary to established constitutional requirements, State law and court rules.
VII
Having thus rejected the improvisation of a new drawing of an array from the existing pool of qualified jurors, the question becomes one of whether I shall grant the People’s request to adjourn the trial until such date as the County of Richmond has purged the pool of qualified jurors of all persons selected under impermissible procedures and has reconstituted the pool in a manner consistent with Federal and State law. In spite of past nonperformance, I will assume with the use of technology available through the Office of Court Administration, that a new pool and drawing of an array can be accomplished in a relatively short time.
I do not believe that a further delay would be appropriate.
The trial of this case was put off for almost two years upon the specific premise that the mandates of the Supreme Court of the United States, the Legislature of the State of New York, and the rules of the Appellate Division would be complied with. The grant of a further opportunity to the responsible county officials to comply with clear and unambiguous requirements of law would be to sanction almost two years of inaction.
In the context of the remoteness in time of the events underlying this prosecution and the defendant’s readiness for trial in February, 1975 and the considerable opportunity given the county to correct the unlawful condition, I believe the State has failed to fulfill its obligation of providing a forum for the resolution of the charges it has brought.
The motion to dismiss the indictment in the interest of *36 justice and, also, because of the denial of the right to a speedy trial is granted.

 E.g.
"Q. 21 Have you any opinion as to circumstantial evidence which would prevent your finding of guilty upon such evidence?
"Q. 22 Are you aware of any prejudice against any state law which would prevent a finding of guilt for violating such law?
"Q. 23 By law the failure of a defendant in a criminal case to testify is not considered as any evidence of his guilt. Would you give a defendant the benefit of this law?”
These questions do appear in the forms authorized by prior rules. (See, e.g., Gilbert Criminal Law and Procedure, 1971, Rules of the Appellate Division, First Department, § 620.18; see Sixth Ann Report of NY Judicial Council; NY Legis Doc, 1940, No. 48, p 214 et seq.)