Leon B. Polsky, J.
The defendant moves to dismiss the indictment against him claiming that he has been denied his right to a speedy trial and that the indictment should be dismissed in the interest of justice. The defendant also challenges the array of prospective jurors summoned for February 7, 1977 — the date fixed for the trial of the indictment.
BACKGROUND
In February, 1973 the Grand Jury of the Extraordinary and Special Term of the Supreme Court voted to indict the defendant upon charges of conspiracy and bribery. On April 22, 1974 the indictment was signed and filed and the defendant promptly arrested and arraigned.
Pretrial motions were made and decided by the late Justice Murtagh in November, 1974 and the case marked "ready” by both sides. At the same time two related cases, People v Goode (43 AD2d 1022) and People v Hasson, were also pending before the court. The Goode case was tried in late 1974 and the Hasson case set down for an identification hearing followed by trial in January, 1975. In January, 1975 the court marked this case "subject to” the Hasson case, meaning that the trial of Bartlett was to follow the trial or disposition of the Hasson case. The Hasson case did not go to trial in January, 1975 because of the Supreme Court decision in Taylor v Louisiana (419 US 522) which in Justice Murtagh’s view necessitated a new selection of venire persons. Throughout all of 1975 and most of 1976 the Hasson case was adjourned almost monthly. Except for the first few, the adjournments were to accommodate the trial schedules of Justice Murtagh and the several attorneys in the Hasson case. In January, 1976 the Hasson and Bartlett cases were reassigned to me for trial. Because of the death of Justice Murtagh, reargument was had before me *876 on certain pretrial motions and in the spring of 1976 the Hasson case was set down for trial in October. When the Hasson case was moved to trial, I sustained the defendant’s challenge to the array of prospective jurors and granted a motion to dismiss the indictment both in the interest of justice and for failure to afford the defendant Hasson a speedy trial (People v Hasson, 89 Misc 2d 28).
Meanwhile, at the first appearance before me in January, 1976 the defendant Bartlett moved for reconsideration of various discovery and inspection motions previously denied by Justice Murtagh. He also moved for dismissal of the indictment claiming a denial of a speedy trial because of his case having been held "subject to” the Hasson case. On February 3, 1976 I denied the speedy trial motion without prejudice to renewal with minutes of the prior adjournments annexed. Counsel promptly ordered the minutes; however, when the court reporters failed to respond I granted an order directing prompt transcription and filing. When the court reporters failed to respond to that order, I issued an order directing them to show cause why they should not be held in contempt. By the return date of the show cause order, all of the necessary minutes had been made available and the defendant renewed his speedy trial motion. I denied the motion on October 25, 1976 finding that although the defendant’s counsel did not consent to the continuous adjournments "subject to the Hasson case” he had failed to adequately protest the marking and, in effect, had acquiesced in the adjournment of the Bartlett trial until after the disposition of the Hasson case.
Upon the dismissal of the Hasson case, this case was advanced and adjourned to permit the defendant to make whatever motions he deemed appropriate. The case was set down for trial in the week of February 7, 1977 subject to the determination of the defendant’s motions.
The defendant’s motions challenge the array of prospective jurors summoned for February 7, and seek the dismissal of the indictment because of the alleged failure to afford the defendant a speedy trial, in the interest of justice, and because of the alleged exclusion of women from the Grand Jury which voted the indictment and other possible irregularities occurring before the Grand Jury.
The People responded by alleging that the jury selection system found by the court to be invalid in People v Hasson, *877 had been corrected by the creation of a new pool of qualified jurors and the case was ready to proceed to trial with a venire meeting the standards reiterated in Hasson. The People contended that the defendant’s challenge of the Grand Jury proceedings was untimely and that the People have been continuously "ready” for trial on this case and neither the Federal nor State speedy trial requirements or the interest of justice require the dismissal of the indictment.
Subsequently, the People withdrew the contention that the jury pool had been reconstituted since the Hasson decision.[1] *
THE CHALLENGE TO THE GRAND JURY
To the extent that the defendant’s motion seeks to challenge the composition of the Grand Jury independent of the Taylor decision, the motion is denied as untimely. Time requirements with respect to pretrial motions will be strictly enforced as to matters unrelated to the guilt or innocence of a defendant or the ultimate fairness and accuracy of the truth-finding process. To the extent that the present motion raises issues unrelated to the Taylor decision, it should have been made as part of the initial omnibus motion.
To the extent reliance is placed upon Taylor, the motion is denied because the Grand Jury was empanelled and returned its indictment prior to the Taylor decision. It is clear that Taylor is not to be applied retrospectively. (Daniel v Louisiana, 420 US 31; Matter of Alessi v Nadjari, 47 AD2d 189.)
THE POOL OF QUALIFIED JURORS
The precise number of qualified jurors in the pool of qualified jurors is unknown. Uncontradicted testimony establishes the number to be between 17,000 and 20,000 with 18,000 being the best estimate.
Approximately 6,000 persons, or one third of the pool, are summoned each year for jury service at the several terms of the various courts in the county. In each of the four years immediately preceeding the Taylor decision and the repeal of the "women’s exemption”, the number of women summoned *878 from the pool for jury service consistently averaged between
15 and 16% of the total number summoned.[2]
In each of the two years after Taylor (1975 and 1976) not more than 2,000 volunteers were added to the pool to replace those who died or moved from the county. Testimony adduced at the hearing established that males numerically dominated the volunteer group by a multiple of four or five.
Although we do not have the exact percentage of women in the pool, the drawings over the four-year period (1971-1974) and the two drawings for November 1, 1976 and February 7, 1977 establish with statistical certainty that women constitute between one sixth and one seventh of the persons in the jury pool.
THE COMMUNITY
As reported in the 1970 census[3] women comprise 51.14% of the total population of Richmond County and 51.68% of the population between the ages of 18 and 75. Of the 137,591 persons registered as voters in 1974, 70,858 or 51.49% are women.[4]
Persons in the age group 18 through 29 constitute 17% of the total population and 29.09% of population in the age group 18 to 75.
THE ARRAY
The panel summoned for jury service on February 7 consists of 104 persons, 16 of whom (15.3%) are women. These figures are virtually identical to those in the Hasson panel of November 1, 1976 where out of 103 persons, 16 or 15.5% were women. As to age of prospective jurors, the February 7 panel *879 is also similar to the November panel and is reflected in the table below.
Nov. 1 Feb. 7 1976 1977 Under 30 2 0 30-39 16 22 40-49 26 25 50-59 31 28 Over 60 28 21
As was the case with the November 1 panel, the jury qualification cards for the array indicate extensive prior service by the summoned jurors — 25 of whom have been summoned for jury duty on over 10 prior occasions. As with the Hasson array, the prospective jurors average seven prior calls for jury service per juror.
DISCUSSION
The parties have stipulated to the inclusion of the hearing minutes in People v Hasson (89 Misc 2d 28) in this proceeding.[5] The additional evidence submitted during this proceeding is confirmatory of my earlier finding that the particular venire accurately reflects the composition of the pool of qualified jurors but the pool itself does not remotely approach a " '[reasonable reflection of] a cross-section of the population suitable in character and intelligence for [jury service]’ ” (People v Parks, 41 NY2d 36, 42, quoting from Taylor v Louisiana, supra, pp 527-528). The nonrepresentative nature of the current pool and the February 7 venire is due to the continued reliance upon a qualified juror pool built up at a time when women were permitted to claim an automatic exemption from jury service. Even if the New York exemption were found to be constitutional in the two weeks of its post-Taylor existence, the County of Richmond cannot freeze its present jury system into a mold created by a statute which the Legislature repealed two years ago.
Whether the statute allowing women to claim an automatic exemption is or was unconstitutional on its face or in its application is a moot point. The fact is that any venire *880 randomly drawn from the existing pool will not fairly reflect a cross section of those persons who have the qualifications to be jurors.
The recent decision by the Court of Appeals in People v Parks (supra) does not alter this result. In Parks, the defendant’s trial took place one week after the Taylor decision before a jury selected from an array chosen from a larger pool of qualified jurors of whom one third were women. It was stipulated that women comprised one third of the prospective jurors summoned and available in any particular week. Because of the substantial number of women on the Nassau County array, the court did not have to reach the question of whether application of the repealed statute led to impermissible jury compositions. However, it is not the number of women on the panel which is the principle distinguishing feature between Parks and this case.
Here we are not concerned with the application of a statute during its brief post- Taylor existence; we are dealing with a practice which continues unabated the impermissible impact of the statute two years after its repeal!
The People’s reliance upon Hamling v United States (418 US 87) as authorizing delay in reconstituting the panel is misplaced. The Federal district in which Hamling was prosecuted had adopted a plan of jury selection specifically authorized by Congress. (US Code, tit 28, § 1863, subd [b], par [4]) which called for the emptying and refilling of the master jury wheel every four years. When Hamlings jury was summoned the wheel contained only persons whose qualifications had been established more than three years earlier. Thus persons who had come of age or newly registered as voters in the district were, as a class, not included in the master wheel at the time Hamlings venire was drawn. In rejecting the petitioner’s contention that his jury was not drawn from a fair cross section of the community because newly eligible young adults had not been in the wheel, the court stated (p 138): "Unless we are to require the daily refilling of the jury wheel, Congress may necessarily conclude that some periodic delay in updating the wheel is reasonable to permit the orderly administration of justice. Invariably of course, as time goes on, the jury wheel will be more and more out of date, especially near the end of the statutorily prescribed time period for updating the wheel. But if the jury wheel is not discriminatory when completely updated at the time of each reñlling, a prohibited *881 'purposeful discrimination’ does not arise near the end of the period simply because the young and other persons have belatedly become eligible for jury service by becoming registered voters.” (Emphasis added.) Hamling simply stands for the proposition that an otherwise valid jury pool will not be struck merely because a time deemed reasonable by Congress has passed without additional persons being added to the pool. It does not suggest that the State may retain and maintain a dramatically unbalanced pool by doing nothing to correct the accumulated sexual disparity in the composition of the pool. Here we are not dealing with a time lag either deemed reasonable by a Legislature or necessary administratively. At a time when the other more populous New York City counties were taking affirmative action to eliminate the imbalance, Richmond County decided to go its own way with an obsolete pool or master list of qualified jurors. This conscious and deliberate decision was made with actual knowledge of the findings of Justice Titone in People v Chalupa (supra), that in each of the four preceding years random drawings from the pool had produced venires in which men were over represented by about five times their proportional strength in the community.
The challenge to the array is allowed. The underrepresentation of women in the venire and in the master pool is the result of systematic and purposeful discrimination against women.
A second aspect of the defendant’s challenge to the array is the assertion that young persons have been excluded from jury service. This issue is most frequently raised in the context of an authorized jury qualification procedure which calls for the preparation of a master jury list or pool every three or four years. (See e.g., Hamling v United States, supra; United States v Gooding, 473 F2d 425; United States v Kuhn, 441 F2d 179; see, also, 1974 Opns Atty Gen 251.) Unlike those cases we are not here concerned with a small age group that has been temporarily eliminated from jury service out of administrative necessity; here we have a gross underrepresentation of the age group 18 to 30 which comprises 17% of the total population and 29.09% of the adult population presumptively eligible for jury service.[6]
*882 If the February venire had been a statistical reflection of the community there would have been 31 persons under 30 years of age on the panel. There were none. Even combining the February and November venires results in only 2 persons under 30 out of 207 prospective jurors. The disparity between the number of jurors under 30 and their representation in the community is not the result of statistical accident. The procedures used by the county to obtain its jury pool are the direct cause of the underrepresentation.
As previously noted in People v Hasson, Richmond County has not fully reconstituted its jury pool since 1940. Once the pool stabilized at 18,000, no new persons were added except to replace those who died or otherwise no longer qualified. These replacements, even if statistically reflecting the age of the community at the time added, never amounted to more than 2,000 persons in any year and could not balance off the aging panel.
An additional factor which would exacerbate the imbalance in the panel is the size of the permanent pool combined with the use of the volunteer system.
As noted in People v Chalupa (supra), jurors are summoned at the rate of approximately 6,000 per year.* *****[7] At this rate, and as reflected by the jury qualification cards and the frequency of service, a qualified juror can expect to be called once every three years. This repetitive service of necessity will discourage volunteers from groups, such as young persons, who lack the job or financial security needed to meet the demands of membership in a small permanent pool.
Jury service is an obligation of citizenship and its incidence is to be borne as widely as possible. The creation of a permanent pool changes the obligation into a burden to be avoided by all who cannot afford the demands that repetitive service entails. It is unfair to those members of the community who perform this duty willingly; it is unfair to the defendants who *883 are entitled to a judgment from a cross section of the community.
I therefore sustain the challenge to the array upon the added ground that persons under 30 have been improperly excluded from the pool and a venire representing a cross section of the community cannot be obtained by use of the existing pool of qualified jurors.
The relief to be granted is more troublesome. Unlike Hasson the delays here were not directly generated by the Taylor decision and the assumption that the situation described in People v Chalupa (supra), was being corrected. However, the defendant’s case has been tied to Hasson’s and, for at least one year has been delayed over his objection.
In view of the substantial economic loss sustained by the defendant directly flowing from the indictment and the delays encountered which were not of his making, I believe the defendant is entitled to the same relief granted the defendant Hasson in the companion case.
The motion to dismiss the indictment is granted.

. Although no evidence has been taken on the subject, I am aware that thousands of persons have been summoned since the Hasson decision and have been interviewed to ascertain their qualifications. For reasons which neither side has placed on the record, these additional persons did not form part of the pool from which the venire was drawn.

. Total Jurors Total Summoned Women Women Percent 1974 5,700 905 15.87 1973 5,850 896 15.3 1972 5,605 853 15.2 1971 6,198 936 15.1
In none of the 46 months for which jurors were summoned did the proportion of women exceed 23% of the total or fall below 2-Vi. In 5 of the months women constituted over 20% and in 11, less than 10%. (People v Chalupa, Ind. No. 324/1974, Feb. 7, 1975.)

. Volume 1, Part 34, Table 35, 1970 Census of Population, U.S. Dept, of Commerce

. NY Legis Manual, 1975, p 1339.

. The Attorney-General represents the People in both proceedings. Although counsel for the defendant Bartlett did not participate directly in the Hasson matter, he was present during those proceedings. In both cases, the District Attorney of Richmond County was invited by the court to participate.

. Use of 29.09% as the basis for comparison with the actual composition of the venire is appropriate. If the present pool had been drawn solely or predominantly from current voter registration then, if available, the percent of young persons *882 registered — as opposed to their proportion in the adult population — would be the basis for comparison (but see, Castanida v Partido, 524 F 2d 481, cert granted 426 US 934). However, no one in the present pool is there because they are currently registered as voters. The present qualified jurors are in the pool because they volunteered in the past or because they were summoned from registration lists now between 3 and 35 years out of date.

. This does not mean they actually serve on a jury or are placed on a panel. Many are excused or have their service postponed by the clerk. It is to be noted that a juror who serves may not be called again for two years. (Judiciary Law, § 601.)