Wilmer J. Patlow, J.
This is a motion by defendant, pursuant to CPL 270.10, challenging the composition of the Monroe County jury pool. The grounds for the challenge are that women, Blacks, young people between the ages of 18 and 24, and city residents are underrepresented and that such underrepresentation violates the! defendant’s constitutional rights by denying him a fair trial by a jury representative of a cross section of the community.
An extensive evidentiary hearing was held before this court.
The Monroe County jury pool consists of 65,456 names and is known as a permanent pool. Ih order to analyze the pool, statistical sampling techniques were employed by defendant’s two expert witnesses, Mr. Eric V. Swanson and Dr. Charles Winick, who based their testimony on three separate, different and distinct samples.
The first such sample, the 1975 sample, consisted of approximately 625 qualified jurors who had been summoned for service on three specific dates in the summer and fall of 1975. These names were scrutinized to determine gender and residence and that data was placed beside the 1970 census figures for comparison. Such scrutiny and comparison revealed that 39% of the sample were female and 35.5% were city residents, while women made up 52.7% of the county population and city dwellers 42.3% of that population.
Another sample utilized, referred to as the voir dire sample, consisted solely of affidavits of various defense counsel who were engaged in felony trials during the latter half of 1975. Such affidavits merely stated the approximate number of veniremen brought into the courtroom, and the number of Blacks that affiants observed in those groups. Only 12 Blacks were observed out of a total of 344 veniremen, a percentage of 3.5%, although Blacks constitute ¡ 6.2% of the population of Monroe County.
*553 A third sample, and by far the most comprehensive, was the 1976 sample which consisted of approximately 600 names, representing every seventeenth juror out of a total of 10,000 persons, drawn from the permanent jury pool, who were called to serve that year. The original juror questionnaire, completed by each of the 600 persons constituting the sample, was analyzed to ascertain residence, sex and age. This analysis revealed that women constituted 38.8% of the sample and city residents 31.5% while remaining 52.7% and 42.3%, respectively, of the total county population. In addition, the analysis showed that although persons in the 18-24 age group comprised 18.9% of the county population, they account for only 7.3% of the sample.
Since the original juror questionnaire does not reveal race, census tracts which show racial data were utilized to determine racial composition. Thus, if, for example, a given census tract was 50% Black, 50% of the jurors residing in that tract were presumed to be Black. Applying this technique, Dr. Winick determined that there were tentatively 20.6% Black jurors in the 1976 sample of 600 names. By utilizing a rather sophisticated corrective factor, based upon the theory that there were more Blacks than whites under 18 and over 74, and hence ineligible for jury duty, the Black juror figure was ultimately reduced to 17.3. As a result, Blacks comprised 2.9% of the sample, while constituting 6.2% of the total county population.
The People rely primarily upon the testimony of two witnesses, the Monroe County Commissioner of Jurors, A. Raymond Uttaro, and Election Commissioner, V. James Chiavaroli.
Commissioner of Jurors, A. Raymond Uttaro, testified that he used voter lists, Department of Motor Vehicle registrations, and volunteers as the sources for his jury selection process, and approximately 95% of the jurors ultimately selected for his pool came from the voter lists. Previously, the conynissioner had also used the city directory and the telephone book. However, use of both of these sources ceased; the city directory because of bias against females and younger persons; the telephone directory because of 36,000 unlisted numbers, as well as bias against females and Blacks.
Since taking office in May of 1971, Commissioner Uttaro, over the course of the next several years, sought the lists of utility customers from the Rochester Gas & Electric Company; *554 new census information from thei Census Bureau; social security numbers from the Department of Health, Education and Welfare; names of local taxpayers from the State Tax Commission and the Internal Revenue Service; and lists of names of welfare recipients from the Monroe County Department of Social Services. All of these requests were refused, primarily on the grounds of confidentiality. In addition to the foregoing, the commissioner attempted to obtain clauses in collective bargaining agreements involving the area’s largest union, the Amalgamated Clothing Workers of America, allowing workers to serve on jury duty without loss of compensation.
The commissioner further testified that his office completes canvassing the entire cycle of wards and towns in Monroe County for new jurors approximately every 18 months. Thus, although not done in alphabetical or numerical order, all 24 city wards and 19 suburban towns are surveyed at least once in 18 months. ¡
Over and above all of the foregoing, Commissioner Uttaro testified to certain actions he had taken in order to increase the number of women, young pedple and Blacks in the jury pool. Soon after taking office, and well before the lifting of the women’s exemption, the commissioner discontinued use of an affidavit attached to the original jury questionnaire and mailed to respective jurors. That affidavit enabled women to claim their exemption, and by ¡discontinuing its use, the commissioner found less women making such claim. Immediately prior to the termination of the women’s exemption on September 1, 1975, the commissioner retrieved from his files the names of approximately 2,000 women who previously claimed that exemption and commenced resurveying them for infusion into the permanent pool. Prior to this action, the commissioner estimated that the permanent pool was 70% male and 30% female.
In the case of young people he followed a similar procedure. During the period when 18-year-olds were allowed to vote and therefore appeared on the voter lists, but were still ineligible for jury duty, the commissioner accumulated between 600 and 800 names of persons under 21 and those names were immediately infused into the pool in September of 1974 when the law first allowed persons under 21 years of age to serve on juries.
Because of a low rate of response to questionnaires in the predominantly Black city wards, the commissioner "blankets” those wards with substantially heavier mailings. Such blan *555 keting of the voter registration list began in 1975 and is continued to date.
Because of these positive actions, certain statistical data emerged which may be characterized as a "corrective bias.” Thus, we find that 62.9% of the names added to the panel in 1976 were women; and 21.4% of the names added to the panel thus far in 1977 are in the 18 to 24 age group.
As to the permanent pool, Commissioner Uttaro testified that well over half of that pool, or approximately 33,000 names, had been added since he became commissioner in 1971; and that by his latest count, the pool now contained 57% men and 43% women.
The Commissioner of Elections, V. James Chiavaroli, testified that each year he submitted a current list of registered voters to the Commissioner of Jurors. He further testified that approximately 72% of the population of Monroe County were registered to vote in the year 1970.
During the course of his testimony, various statistical charts were introduced and received into evidence to show that the percentage of jurors in the permanent pool from the predominantly Black areas was virtually identical to the percentage of registered voters from those areas; and that the percentage of city residents in the permanent pool was at least as great as the percentage of city residents on the voter registration lists. Thus, for example, the exhibits revealed that in 1976, jurors from the four city wards with census tracts over 50% Black constituted 3.34% of the total voters in the entire county and 3.37% of the total jury pool; and that while city residents constituted 30.5% of the 1976 voter registration lists, they comprised 33.0% of the jury pool.
Presumably, as a result of the previously mentioned blanketing of the predominantly Black wards, jurors accepted from those five high density Black wards canvassed between January, 1975 and April, 1977 represented 27.8% of the 21,654 new jurors accepted during that period, although they constituted only 16.7% of the registered voters in Monroe County.
At the outset, the People have presented two threshold type issues which require prior determination.
The People raise the quasi-procedural argument that the challenge must fail because it is not directed to the panel of prospective trial jurors actually drawn, namely, the 225 ve *556 niremen who were summoned for jury service on June 6, 1977 (scheduled trial date). They contdnd CPL 270.10 requires that the challenge be directed to the panel of prospective trial jurors actually drawn, not merely the jury pool. Since that was not done here, the People argue that defendant’s motion must be dismissed for failure to present even a statutory premise upon which to build a prima facie case.
This quasi-procedural argument is in reality similar to the one raised in People v Attica Bros. (79 Misc 2d 492), namely, that CPL 270.10 is limited in its application solely to jury panel challenges, and cannot be utilized to attack a jury pool. While agreeing that the procedure under CPL 270.10 may not embrace a challenge to a jury pool as opposed to a jury panel, the court went on to state (p 493) that defendant’s constitutional rights require "as an essdntial corollary, the right to assert the failure of those charged with the jury selection process to comply with the constitutional guarantee and all State statutes, rules and regulations enacted to implement it.” The court further pointed out that a present resolution of this question was necessary for the orderly administration of justice and "that the affidavits in support of the motion asserted facts sufficient to raise serious constitutional questions about the composition of the! jury pool” (p 493).
The very same factors and reasons are present in the case at bar and therefore the court must reject the People’s quasi-procedural argument.
The second threshold type issue Raised by the People is their contention that neither the 18-24 age group, nor city residents, constitute a recognizable, distinct class whose exclusion or underrepresentation from jury¡ service violates defendant’s constitutional rights.
The court concurs with this contention.
The parties agree that an initial test to be applied in judging whether or not a jury selection system meets constitutional standards has been recently spelled out by the United States Supreme Court in Castaneda v Partida (430 US 482).
That test reads as follows (supra, p 494): "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.”
Applying this test to both the 18 to 24-year-olds and to city *557 residents, we find that neither group has been "singled out for different treatment under the laws, as written or as applied.” Neither section 13 of the New York State Civil Rights Law, nor rule 1025.2 of the Appellate Division, Fourth Department (22 NYCRR 1025.2) specify age or residency as criteria of discrimination.
Moreover, "[challenges based upon discrimination against a particular age group have met with virtually unanimous failure.” (Gewin, An Analysis of Jury Selection Decisions, 506 F2d 811, 823 [found in appendix to Foster v Sparks, 506 F2d 805].) Furthermore, courts have consistently rejected "[y]outh as a factor in jury selection matters.” (People v Attica Bros., supra, pp 494, 495 [and cases cited therein]; United States v Ross, 468 F2d 1213; United States v Cohen, 275 F Supp 724; People v Rosado, 89 Misc 2d 61, 64 [and cases cited therein].)
No cases or legal authority have been brought to the court’s attention wherein the absence or underrepresentation of jurors from specific political subdivisions within the court’s or jury commissioner’s jurisdiction, such as cities, villages or towns, has been held sufficient cause to quash a jury panel or pool on constitutional grounds. Mere geographical imbalance does not render a jury plan illegal. (United States v Test, 399 F Supp 683, 686, n 2 [citing United States v Lewis, 504 F2d 92, 99].)
Having resolved these two threshold type issues, we now turn to the heart of defendant’s challenge, the alleged under-representation of women and Blacks in the Monroe County jury pool.
There is no question but that these two groups surmount the first step spelled out in Castaneda v Partida (supra), and quoted above. Both section 13 of the Civil Rights Law and rule 1025.2 of the Appellate Division, Fourth Department, clearly designate color and sex as criteria which cannot be used discriminatorily in the jury selection process.
This hurdle cleared, we return to Castaneda and find that "the defendant must [also] show * * * substantial under-representation * * * of the identifiable group [and] the degree of [such] under-representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as * * * jurors over a significant period of time.” (Castaneda v Partida, supra, p 494; emphasis added.) emphasis added.)
The court believes the defendant has complied with that *558 portion of the Castaneda guideline relative to the comparison method of submitting proof.
However, the court finds in the case of women, the disparity-evidence presented, whether one accepts defendant’s figure of 39% women in the jury pool or the People’s 43% count; contrasted to 53% women in the total population, does not meet the preliminary and primary requirement, namely, the showing of substantial underrepresentation.
Significantly greater disparities than shown here between men and women in jury pools have most recently, under similar attack, been judicially sustained. (People v Parks, 41 NY2d 36 [33% women]; People v Sibila, 81 Misc 2d 80 [33%]; People v Kessler, 81 Misc 2d 492 [31%]; People v Tabb, 80 Misc 2d 431 [20%-35%]; People v Moore, 80 Misc 2d 166 [20%].)
Of course, enormous differences have prompted court intervention. (People v Hasson, 89 Misc 2d 28 [15.5% women].)
The Supreme Court of the United States in the landmark case which struck down female exclusion and automatic exemption from jury service, Taylor v Louisiana (419 US 522, 537), stated: "we think it is no longer tenable to hold that women as a class may be excluded or given automatic exemptions based solely on sex if the consequence is that criminal jury venires are almost totally male. ” (Emphasis supplied.)
Since the evil sought to be corrected by the court in Taylor was "criminal jury venires * * * almost totally male,” we believe that the substantial underrepresentation test applied here is in conformity with the thrust and spirit of that decision.
We now consider the question of whether or not Blacks are substantially underrepresented in the jury pool.
At first blush, defendant’s statistical evidence, and more specifically, the voir dire sample, would appear to meet the Castaneda requirement of substantiality. That sample was designed primarily to measure the extent of Black representation in the jury pool and, unlike the 1976 sample, measure that representation directly. The sample revealed 3.5% Blacks in the pool and 6.2% in the total population, a ratio of virtually 2 to 1.
However, jury composition challenges based on race, with disparity figures remarkably similar to those in the case at bar, have been dismissed because such disparities were not *559 found substantial enough to deprive a defendant of his constitutional rights (United States v Jenkins, 496 F2d 57; Anderson v Casscles, 531 F2d 682.)
Jenkins affirmed a finding that 3.3% Blacks on the jury source list contrasted to 5.45% in the total population did not constitute a substantial disparity.
That finding was predicated on a showing by the trial court that the mere addition of one Black juror to the average array of 50-60 veniremen resulted in absolute percentage equality. The court went on to state "the test of fairness * * * is the more practical one of the difference in absolute numbers rather than the difference in percentages. Judged by this standard, a difference of one (1) Negro in a panel of 60 jurors is not substantial.” (United States v Jenkins, supra, p 66.)
In Anderson, a 4.4% to 2% disparity between Black population figures and the jury panel was sustained despite constitutional challenge. The Anderson court explained and approved the procedure used in Jenkins to determine whether or not a disparity was in fact substantial. That determination was based on numerical effect rather than percentage effect. (Anderson v Casscles, supra, p 685, n 1.)
This "numerical effect” test may best be illustrated by a simple example: Given a county with a 4% Black population, if one juror out of a 50-member panel is Black, we have a disparity ratio of 2:1 (4% to 2%). However, the addition of only one Black juror completely eliminates the disparity.
Clearly, the presence or absence of one juror on a panel is too thin a reed upon which to build a challenge of constitutional proportions.
Applying the "numerical effect” test to the facts at bar, we find that by adding one Black juror to the number of Blacks in each of the jury panels that comprise the voir dire sample, the disparity totally disappears. Likewise, the addition of one Black juror to every 50 veniremen in the 1976 sample produces practically the same result.
Therefore, the court finds that the disparity here between the number of Blacks in the jury pool and their number in the total population is not substantial enough to deprive defendant of his constitutional rights.
Returning once more to Castaneda, we find that a defendant must show substantial underrepresentation of a recognizable, distinct group in order to make out a prima facie case. *560 (Castaneda v Partida, 430 US 482, 494, supra.
This court, having found that the 18-24 age group and city residents are not recognizable, distinct groups for purposes of jury composition challenge, and that women and Blacks are not substantially underrepresented in the Monroe County jury pool, now finds that defendant has failed to make out a prima facie case.
Therefore, this motion must be dismissed and the challenge to the composition of the Monroe County jury pool denied.
During a concluding session of the evidentiary hearing, a question arose as to whether or not defense counsel was entitled to examine four documents described as communications between the District Attorney’s office and the Commissioner of Jurors.
The court withheld a ruling oh that question pending the parties’ submission of memoranda in support of their respective positions.
Because these four documents were in a file on the Commissioner of Jurors’ lap while he testified, defense counsel contends that they constitute a witness’s prior statement, and that under People v Rosario (9 NY2d 286), he is entitled to examine them to determine their possible use in cross-examination. Defense counsel further contends that under People v Malinsky (15 NY2d 86), the Rosario rule applies to a hearing on a challenge to a jury panel.
Based upon the foregoing, defendant requests that the hearing be reopened and the Jury Commissioner required to produce the four disputed documents for the benefit of the defense.
The People respond by arguing, inter alia, that Rosario and Malinsky do not apply to this proceeding, since it is not truly criminal in nature.
Although the court believes that its finding that defendant has failed to prove a prima facie case renders this evidentiary issue moot, it would point out that it is unwilling to extend the Rosario rule to a hearing of a jury composition challenge.
Despite the fact that this hearing was held pursuant to the Criminal Procedure Law (CPL 270.10), and that Malinsky (supra, p 90) specifically states "it matters not whether the witnesses are testifying at a trial or a hearing,” the court believes the Rosario doctrine inapplicable to this proceeding.
*561 Both Rosario and Malinsky arose within a prosecutory context, be it trial or hearing, wherein an ultimate finding of a defendant’s guilt or innocence could directly or indirectly be predicated upon, or attributed to, a defense counsel’s ability to obtain and use a witness’s prior statement. It was an awareness of this possible effect on that ultimate finding which led the Rosario and Malinsky courts, motivated, in their own words, by "a right sense of justice,” to rule in favor of allowing defense counsel to obtain such statements.
No such possible effect is present here. Neither the guilt nor innocence of this defendant can directly or indirectly be predicated upon, or attributed to, defense counsel’s ability to obtain and use the four communications in question. Absent the possibility of this effect, the rationale of the Rosario and Malinsky decisions is inappropriate and inapplicable.
Therefore, not only because the court believes this issue moot, but also because it believes the Rosario rule does not apply to a jury challenge hearing, defendant’s request to reopen the hearing is denied.
Although the court has found that the underrepresentation of Blacks in the jury pool is not substantial enough to violate constitutional standards, it believes that an increase in the number of Blacks in the pool is desirable.
To that end, the court directs the Commissioner of Jurors to continue blanketing the voter registration lists in the predominantly Black wards. This type of special effort to increase Black representation on juries has been judicially approved. (Anderson v Casscles, 531 F2d 682, 685, supra.) In addition, the court would direct the commissioner, as soon as practicable, to resume the use of the city directory, and commence utilizing the City of Rochester tax accounting rolls and the tenant lists of the Rochester Housing Authority as supplementary sources of jury recruitment in those same wards.*
This case, having been set down for trial September 28, 1977, subject to determination of the motion, may now proceed to trial on that date.

 Although not presented at the evidentiary hearing and therefore not part of the record, appropriate samples from the city directory and tax rolls were included in defendant’s brief which impress the court with the potential usefulness of these two supplementary sources.