STATE OF WEST VIRGINIA

*v.*

JACK HOBBS

(No. 14311)

STATE OF WEST VIRGINIA

*v.*

HAROLD K. WHITMAN

(No. 14327)

Decided July 29, 1981.

Rehearing Denied October 8, 1981.

14

*Barrett, Chafin, Lowry & Hampton and Ray L. Hampton, II*, for plaintiff in error.

*Chauncey H. Browning*, Attorney General, *Willard A. Sullivan, Jr.*, Special Assistant Attorney General, for defendant in error.

McGRAW, JUSTICE:

The appellants, Jack Hobbs and Harold K. Whitman, appeal from the final judgment of the Circuit Court of Logan County, the Honorable Fred L. Fox II presiding as Special Judge, which adjudged the appellants guilty, upon a jury verdict, of making a false return of the result of the votes cast for a candidate at an election in violation of W.Va. Code § 3-9-1 (1979 Replacement Vol.), and sentenced them to imprisonment in the State Penitentiary for a term of not less than one nor more than ten years. These two cases were consolidated for decision because they present several identical issues. Both appellants assert that there was a material variance in the allegations in the indictment and the proof adduced at trial, that the trial juries

were unconstitutionally selected and empanelled, and that the trial court erred in not conducting an evidentiary hearing with respect to the selection of the jurors. In addition, appellant Hobbs contends that the trial court erred in not polling the jury on the question of prejudicial pre-trial publicity at his trial, and appellant Whitman alleges that the trial court influenced the jury verdict and coerced the jury into reaching a guilty verdict in his case. We find the errors alleged by the appellants to be without merit and we affirm the judgment of the circuit court.

The appellants were duly appointed election commissioners of Logan County during the primary election held on May 11, 1976, and both served at the Striker No. 2 precinct. On December 15, 1976, a special grand jury sitting in and for the Circuit Court of Logan County returned a multiple count, joint indictment charging the appellants and others with having committed various violations of the election laws of this State. The Honorable H. Harvey Oakley, Judge of the Circuit Court of Logan County, had previously disqualified himself from presiding over the special grand jury, and the Honorable Fred L. Fox II, Judge of the Circuit Court of Marion County, was temporarily assigned by this Court to hear all matters resulting from the special grand jury investigation.

The appellants and others named in the indictments filed several pre-trial motions challenging, among other things, the sufficiency of the indictment and the constitutionality of the manner in which the special grand jury was empanelled. The indictees also requested severance and separate trials. All of these motions were denied by the circuit court by order entered on May 23, 1977. The indictees sought to attack the circuit court's order by prohibition in this Court. A moulded writ was awarded on the issue of severance and separate trials, but we affirmed the circuit court's rulings on the sufficiency of the indictment and the constitutionality of the selection of the special grand jury. *State ex rel. Whitman v. Fox*, 160 W.Va. 633, 236 S.E.2d 565 (1977).

On September 26, 1977, a petit jury was empanelled to try appellant Whitman, and on September 27, 1977, he was found guilty of the crime of making a false return of the result of votes cast for a candidate during the May, 1976 primary election as charged in the third count of the indictment.

On September 28, 1977, a jury was selected to try appellant Hobbs, and on September 30, 1977, a verdict of guilty was returned against him on the same charge which was contained in the fourth count of the indictment. The circuit court entered orders of conviction for appellants Whitman and Hobbs on September 29, 1977 and September 30, 1977, respectively. On September 30, 1977, the court sentenced both appellants to a term of imprisonment in the penitentiary for not less than one nor more than ten years. On May 5, 1978, the appellants were resentenced in order to permit them to appeal their convictions.

I

The appellants first assert that there was a material variance between the allegations in the indictment and the proof adduced at trial. The third and fourth counts of the indictment read as follows:

### THIRD COUNT

The said Harold K. Whitman, on the 11th day of May, 1976, in the said County of Logan, did unlawfully and feloniously and knowingly make, while serving, being and having been appointed an election commissioner, a false return on the result of the votes cast for a candidate, to-wit: candidate Vernon Dingess and others, at Striker #2 precinct during the May 11, 1976 primary election held pursuant to law, against the peace and dignity of the State.

### FOURTH COUNT

The said Jack Hobbs, on the 11th day of May, 1976, in the said County of Logan, did unlawfully and feloniously and knowingly make while serving, being and having been appointed an election

commissioner, a false return of the result of the votes cast for a candidate, to-wit: candidate Vernon Dingess and others, at Striker #2 precinct during the May 11, 1976 primary election held pursuant to law, against the peace and dignity of the State.

At the trial of appellant Hobbs, numerous witnesses were called to testify, including persons who had voted at the Striker #2 precinct during the May 11, 1976 primary election. Several witnesses, all first-time voters, indicated that the appellant had approached them and asked if they needed assistance in voting. Several other witnesses testified that they were illiterate or had difficulty reading and had requested the appellant's aid in voting. None of the witnesses was physically disabled and none was shown how to vote on a sample voting machine. Witnesses testified that the appellant instead entered the voting booth with them, in some cases alone and in other cases accompanied by an unidentified person, and pulled the levers on the voting machine after having been told by the voters which candidates to vote for. One witness testified that she was not aware that the appellant was actually voting for her and that she thought he was simply demonstrating how to use the machine. Another witness testified that appellant Hobbs voted for more candidates than she told him she wanted to vote for. Several witnesses testified that the appellant flipped the levers so quickly that they could not say whether he voted for the candidates they had requested. None of the witnesses could testify with certainty that appellant Hobbs had voted for the candidates they had requested. The two poll clerks who were working at Striker #2 precinct on May 11, 1976, testified that the appellant had made several phone calls from the precinct on that day for the purpose of checking voter registrations and that his signature appeared on the Certification of Democratic Votes Cast in Logan County. One poll clerk testified that she saw the appellant leave the polling place several times during the day. The county clerk testified that Striker #2 precinct was provided with a sample voting machine, that persons requesting assistance in voting were to be shown how to vote on the sample machine, that illiterate or disabled persons could be as-

sisted in voting by two election commissioners of different parties, and that appellant Hobbs was a Democrat chosen by the Democratic Executive Committee to serve as election commissioner.

Much of the testimony adduced at the trial of appellant Whitman came from the same witnesses who testified at the trial of appellant Hobbs and dealt with the fact that Hobbs entered the voting booth and assisted voters without an election commissioner of the Republican Party being present. A poll clerk testified that appellant Whitman was the lone Republican election commissioner present at Striker #2 precinct on May 11, 1976. The county clerk testified that the appellant had been chosen as an election commissioner by the Republican Executive Committee. Testimony indicated that appellant Whitman had made several phone calls from the polling place to check voter registrations. A witness who had voted at the Striker #2 precinct on the day of the election and who was neither physically disabled nor illiterate testified that appellant Whitman had approached her and asked if she needed assistance in voting. He then entered the voting booth with her, accompanied by an unidentified man who left before the voting began. The witness stated that she told the appellant for whom she wished to vote and he pulled the levers for her. She stated that she did not want to vote for delegates to the national convention but was told by appellant Whitman that she was supposed to vote for them. She testified that the appellant pulled the levers and voted for delegates despite her desire not to. Appellant Whitman's signature appears on the certificate of votes cast.

The appellants assert that, viewing the evidence in the light most favorable to the prosecution, the testimony taken at trial might establish at most that the appellants (1) engaged in unlawful electioneering with one or more of the prosecution witnesses in violation of W.Va. Code § 3-9-9 (1979 Replacement Vol.); (2) rendered unlawful assistance to one or more of the prosecution witnesses in violation of W.Va. Code §§ 3-4-21, 3-4-22 (1979 Replacement Vol.); and (3) intimidated, tricked or deceived one or more of the

prosecution witnesses into voting for candidates other than those for whom the witnesses intended to vote in violation of W.Va. Code § 3-9-17 (1979 Replacement Vol.). The appellants contend, however, that the evidence does not prove them guilty of the crime charged, *i.e.* making a false return of the votes cast for a candidate at an election, and that there is therefore a material variance between allegation and proof.

When the State attempts to convict an individual upon proof of a crime which is not charged in the indictment, there is a material variance between the allegation and the proof and the conviction must fall. *State v. Fitch*, ____ W.Va. ____, 263 S.E.2d 889 (1980). W.Va. Code § 3-9-1 (1979 Replacement Vol.) provides in part:

> Every person named and identified in this section, who shall violate any of the provisions of the election laws as herein specified, shall be deemed guilty of a felony and, upon conviction thereof, shall be punished by imprisonment in the penitentiary for not less than one nor more than ten years:
>
> (a) Any commissioner of election or poll clerk who shall knowingly make or cause to be made, or conspire with others to make, a false return of the result of the votes cast for any candidate at any precinct in an election held pursuant to law . . . .

The essential elements of the offense which the State must allege in the indictment and prove at trial in order to sustain a conviction on the charge of making a false return are: (1) the return of the result of the votes cast for a candidate at an election must have been false; (2) such false return must have been made or caused or conspired to have been made by a commissioner of election or a poll clerk; and (3) such official must have known the return to have been false. The manner in which the making of a false return may be accomplished is not specified in the statute, nor need it be alleged by the State in the indictment. *State ex rel. Whitman v. Fox, supra.* Additionally, it is worth noting as Justice Neely said of these same indict-

ments when Hobbs and Whitman were here before in *State ex rel. Whitman v. Fox, supra*, "[u]pon review of the indictments in the cases before us we find that they give fair notice of the offenses under *W.Va. Code*, 3-9-1 [1963] which the State intends to prove, and that any lack of specificity with regard to the details of the alleged violation are discoverable upon proper motion for a bill of particulars." 236 S.E.2d at 574.

The prosecution's theory at trial was that by counting votes which they knew to have been fraudulently or illegally cast, having them recorded as lawful and untainted votes, and signing a certification that the return was true and correct, the appellants then and there knew the return to be false and committed the crime of making a false return. The appellants, however, rely heavily on the case of *State v. Livesay*, 127 W.Va. 579, 34 S.E.2d 24 (1945), where the Court stated:

> Election officials may make such false returns of the results of the votes cast for any candidate in three ways: (1) by adding to the number of votes cast for a candidate; (2) by subtracting votes from the number cast for said candidate; and (3) by adding to the number of votes cast for the candidate's opponent. 127 W.Va. at 583, 34 S.E.2d at 26.

The appellants argue that *Livesay* sets forth the only theories upon which the crime of making a false return may be proven and that the State's failure to produce evidence showing that the appellants engaged in such conduct constitutes a material variation between the allegations in the indictment and the proof at trial. We do not agree.

The prosecution's theory of the case seems quite logical to us. When an election official counts and records as true and lawful votes which he knows to have been illegally or fraudulently cast, does he not knowingly make a false return? To be sure he may not stand accused of counting or recording more or less votes for any candidate than those entered on the ballots taken from the voting machine once the polls have closed and the vote tally has

begun. Has he not, however, accomplished the same result by entering or causing to be entered upon those ballots prior to the closing of the polls votes for candidates for which the voter did not wish to vote? Has he not, in effect, added votes to the total number received by one candidate or subtracted them from the total number received by another? The final tally of the vote is just as false as if it had been achieved by entering a greater or lesser number of votes for any particular candidate on the tally sheet once the polls have closed. The appellants would have us read the statute so as to make it applicable only to those individuals who accomplish the making of a false return in an obvious manner. This we refuse to do. Rather, we think the Legislature intended the statute to apply to clever and creative election fraud as well as to fraud accomplished by more traditional and unimaginative methods.

Our reading of the statute is supported by the very language of the certification of votes cast signed by both of the appellants. The form of such certification, as prescribed by W.Va. Code § 3-6-8 (1979 Replacement Vol.), is as follows:

> We, the undersigned, who acted as commissioners and poll clerks of the election held at precinct No. . . . . . in the district of . . . . . . ., and county of . . . . . . ., on the . . . . . . . . day of . . . . . . . ., do certify that having been first duly sworn, *we have fairly and impartially held the said election according to law,* and the result thereof is as follows . . . . (Emphasis added.)

If the Legislature had intended to limit the offense of making a false return to those instances where there was some alteration of the actual number of votes cast during the tallying of the ballots, there would have been no reason to include in the certification of the return an avowal that the election officials had fairly and impartially conducted the election.

We hold, therefore, that an election official indicated upon a charge of knowingly making a false return of the result of the votes cast for a candidate in an election in violation of W.Va. Code § 3-9-1 may be convicted of such

offense upon proof by the State that such election official fraudulently, illegally or deceitfully caused votes to be entered upon a ballot for a candidate for whom the voter did not intend or desire to vote. The State by its witnesses sought to show that the appellants had unlawfully entered the voting booths with voters, in some instances without being asked to render assistance, and had by various means, knowingly entered upon ballots votes which the voters did not intend or desire to cast. The prosecution also produced evidence that the appellants signed the certification of votes cast as being a true and accurate return of the vote. The State introduced evidence to prove every essential element of the crime with which the appellants were charged in accordance with the allegations in the indictment and with the bill of particulars, and the jury was entitled to find the appellants guilty of the crime charged in reliance upon the instructions of the trial court.

The appellants' second claim is that they were denied a fair trial because the petit jury which convicted them was selected from the Logan County personal property tax rolls in violation of the Sixth and Fourteenth Amendments of the United States Constitution. Specifically, the appellants contend that the selection of the jury from the personal property tax rolls violated their right to a trial jury that represents a fair cross-section of the community under the Sixth Amendment.

Traditionally, challenges to petit jury selection practices were resolved by using equal protection analysis to evaluate claims that specific groups were arbitrarily and systematically excluded from jury lists. This analysis required a showing of systematic discrimination excluding members of a class to which the defendant belonged from serving on juries. Thus, in *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879), the Court held unconstitutional a juror qualification statute which excluded members of the defendant's race from jury service on the ground that the statute operated to deny the defendant the right to a jury of his peers in violations of the guarantee of equal protection of the laws. The Court continued

to emphasize racial exclusion until 1954, when it held invalid a discriminatory classification based upon national origin which excluded members of the defendant's Mexican-American ethnic background from jury service. *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

In *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) the Supreme Court departed from the traditional "same-class" analysis, under which the defendant was permitted to challenge jury selection practices which excluded members of the defendant's race or group, and held that a white criminal defendant had standing to challenge the constitutionality of a jury selection system that excluded blacks from grand or petit juries. Although *Peters* was decided on statutory and equal protection grounds, the Court discussed the import of *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), which held the Sixth Amendment guarantee of a jury trial to be binding upon the states through the Fourteenth Amendment, and of the right to petit jury selection from a fair cross-section of the community.

The shift from traditional equal protection analysis to Sixth Amendment analysis came in the landmark case of *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).[1] Relying on *Peters v. Kiff*, and *Duncan v. Louisiana, supra,* the Court held that a male defendant has standing under the Sixth Amendment to challenge a jury selection system excluding women from jury service unless they had previously filed a written declaration of desire to serve, concluding that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." 419 U.S. at 528, 95 S.Ct. at 697, 42 L.Ed.2d at 697.

We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the

---

[1] For an excellent synthesis of the doctrine of cross-sectionalism and the leading cases through 1975, *see* Daughtrey, *Cross Sectionalism In Jury Selection Procedures After Taylor v. Louisiana,* 43 Tenn L. Rev. 1 (1975).

Sixth Amendment and are convinced that the requirement has solid foundation. The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge.

This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. "Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case .... [T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility." (Citations omitted). 419 U.S. at 530-531, 95 S.Ct. at 697-698, 42 L.Ed.2d at 698.

The Supreme Court further clarified the fair cross-section doctrine:

It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasona-

bly representative thereof. (Citations omitted). 419
U.S. at 538, 95 S.Ct. at 702, 42 L.Ed.2d at 703-704.

The test for resolving the question of whether a particular method of jury selection comports with the Sixth Amendment guarantee of a fair cross-section of the community was succinctly restated in *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586-587 (1979):

> [T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Once the defendant has made out a prima facie case, the burden shifts to the State to rebut the showing of impermissible exclusion.

Clearly, the protection afforded a criminal defendant with respect to petit jury selection under the Sixth Amendment's fair cross-section requirement is more expansive than that afforded under the traditional equal protection analysis.[2] "The States remain free to prescribe relevant qualifications for their jurors and to provide

---

[2] This Court relied upon the United States Supreme Court decision in, *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), in our prior decision involving these appellants, *State ex rel. Whitman v. Fox*, 160 W.Va. 633, 236 S.E.2d 565 (1977). *Castaneda* held that the State of Texas had failed to rebut the defendant's prima facie showing of intentional discrimination against Mexican-Americans in a "key man" grand jury selection procedure. Using equal protection analysis of *Castaneda*, we held in *State ex rel. Whitman v. Fox*, *supra*, that the appellants failed to make a prima facie case of purposeful, invidious discrimination in selecting the grand jury which originally indicted them. 236 S.E.2d at 574-575. That case is distinguishable from the instant appeal because it involved grand jury selection, protected by the Fifth Amendment while the appellants here challenge the selection of a petit jury, controlled by the Sixth Amendment.

reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." *Taylor v. Louisiana,* 419 U.S. at 538, 95 S.Ct. at 701, 42 L.Ed 2d at 702. However, "[t]he right to a proper jury trial cannot be overcome on merely rational grounds." 419 U.S. at 534, 95 S.Ct. at 699-700, 42 L.Ed. 2d at 700. The Sixth Amendment "requires that a significant state interest be manifestly and primarily advanced by those aspects of the jury selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Duren v. Missouri,* 439 U.S. at 367, 368, 99 S.Ct. at 670, 58 L.Ed 2d at 589.

Applying the *Duren* test to the case at bar, we think the appellants have failed to make any prima facie showing that the selection of the special petit juries from the personal property tax rolls of the county resulted in a venire that did not represent a fair cross-section of the community. First, there is no showing that those excluded from the jury list constitute a "distinctive" or "cognizable" group. We adopt the criteria for determining cognizability as stated by the United States District Court for the Southern District of New York in *United States v. Guzman,* 337 F.Supp. 140, 143-144, (S.D.N.Y.), *aff'd,* 468

---

Relying upon *State ex rel. Whitman v. Fox, supra,* and the narrow equal protection analysis of *Castaneda,* we said in footnote 4 of *State v. Williams,* ____ W.Va. ____, 249 S.E.2d 752, 757:

> In order for a defendant to warrant a full hearing on any alleged invidious discrimination on jury selection he must demonstrate that he is a member of a recognizable, distinct group that has been under-represented by comparing the proportion of the group in the total population to the proportion of the group called as jurors over a significant period of time. Once he has statistically shown substantial under-representation of his group, he has made a prima facie case of discrimination, and the burden shifts to the state to rebut that case.

Williams alleged that blacks and poor persons were systematically excluded from both the grand and petit juries which indicted and convicted him. Our holding in that footnote must be limited to only grand jury exclusion claims. *Castaneda v. Partida, supra.* Petit jury exclusion claims must be examined under the more liberal principles of *Peters v. Kiff, Taylor v. Louisiana,* and *Duren v. Missouri, supra.*

F.2d 1245 (2nd Cir. 1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed. 2d 602 (1973):

> A group to be "cognizable" for present purposes must have a definite composition. That is, there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace.

These criteria have been summarized in *United States v. Test*, 550 F.2d 577 (10th Cir. 1976), and *State v. Nelson*, 603 S.W.2d 158 (Tenn. Cr. App. 1980).

We are not convinced that the listing of individuals for personal property tax assessment purposes is a factor which defines or limits a group. Even assuming *arguendo* that the personal property list does adequately define or limit a group, we find no evidence of group cohesion among those not listed on the tax rolls necessary to satisfy the second criterion of cognizability. There is simply no evidence of a "basic similarity in attitudes, ideas, or experience" among those not on the personal property tax list. Finally, there is no indication that those excluded from the jury selection procedure have a "community of interest" which could not be adequately represented by those included on the personal property tax list. We hold that persons not included on a county's personal property tax list do not constitute a cognizable group whose exclusion from the list of potential petit jurors violates a defendant's

Sixth Amendment right to a jury composed of a fair cross-section of the community.[3]

Although the lack of cognizability is dispositive of this assignment of error, we feel compelled to comment further on the requirements of the fair cross-section analysis. Under the second prong of the *Duren* test, the defendant must initially demonstrate the percentage of the community population which is composed of the group allegedly underrepresented. The appellants in the instant case claim that the Logan County personal property tax list included approximately 14,000 entries, and that the 1970 census showed a total county population of 46,000. These figures are not in dispute. The appellants further claim that the method of selecting jurors automatically excluded 69.6 per cent of Logan County residents.

---

[3] The following groups have been found cognizable by other courts considering constitutional challenges: blacks, *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed 664 (1879); women, *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed 2d 690 (1975); Mexican-Americans, *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); and American Indians, *United States v. Smith*, 463 F.Supp. 680 (E.D. Wis. 1979).

Whether certain age groups constitute cognizable groups is less clear. It has been held that persons over sixty-five are a cognizable group, *Williams v. State*, 342 So.2d 1325 (Ala. Cr. App. 1976). In contrast, the Georgia Supreme Court has held that age alone does not determine cognizability. *Bowen v. State*, 244 Ga. 495, 260 S.E.2d 855, *reh. denied*, 446 U.S. 970 100 S.Ct. 2952, 64 L.Ed. 2d 831 (1979). At least one court has held that young adults are a cognizable group, *State v. Pruitt*, 95 Wis.2d 69, 289 N.W.2d 343 (1980), but another court has held that those aged 18-24 are not. *People v. Chesler*, 398 N.Y.S.2d 320, 91 Misc.2d 551 (1977). At least two courts have held that persons aged 18-29 are not a cognizable group. *People v. Estrada*, 93 Cal. App. 3d 76, 155 Cal. Rptr. 731 (1979); *State v. Price*, 301 N.C. 437, 272 S.E.2d 103 (1980). For a list of additional cases where other groups were found to be cognizable, *see* Daughtrey, *Cross Sectionalism In Jury Selection Procedures After Taylor v. Louisiana*, 43 Tenn. L. Rev. at 13, 14 (1975).

There are at least three decisions holding other groups to lack cognizability under the Sixth Amendment analysis. *See People v. Briggins*, 67 A.D.2d 1004, 413 N.Y.S.2d 741 (1979) (persons without driver's license); *People v. Estrada, supra* (persons with less than twelve years of formal education); and *State v. Avery*, 299 N.C. 126, 261 S.E.2d 803 (1980) (persons opposed to the death penalty).

We find the appellants' statistical analysis incomplete and unpersuasive. Statistical accuracy requires additional data be introduced to show which portions of the total census population traditionally are not subject to county personal property tax assessment. The record does not indicate, for example, whether children, spouses, the elderly, or the indigent are assessed for personal property taxes. Without such information, it is impossible to make a meaningful statistical comparison between the number of persons included in the petit jury selection process, the number excluded, and the total population.

The final prong of the *Duren* test requires the defendant to show that the underrepresentation is due to the systematic exclusion of the group from the jury selection process. The appellants offer no argument on this point, contending instead that the trial judge instructed the jury commissioners to select a "blue ribbon" jury of the best citizens of Logan County to support their claim of unconstitutional exclusion. The record simply does not support their contention. After explaining the petit jury selection process as required by W.Va. Code § 52-1-4 (1981 Replacement Vol.), the trial judge told the jury commissioners that "[t]he Code says basically that you pick out persons of sound judgment, good moral character, free from legal exemption. In other words, they are [to be] qualified legally and it's to be a *cross-section of the community*." (Emphasis added). It is evident to us that the trial court meticulously instructed the jury commissioners to select a fair, impartial and qualified pool from which the petit juries could be empanelled.

As a final note on this issue, we do not endorse the use of a personal property tax list as the only constitutionally permissible method for selecting a fair cross-section of the community as potential petit jurors. Our research indicates that courts have approved several alternative methods using various sources of names as within the requirements of the Sixth Amendment. *See State v. Gretzler*, 126 Ariz. 60, 612 P.2d 1023 (1980), *People v. Wai Ming Lee*, 92 Misc.2d 203, 399 N.Y.S.2d 962 (1977), *Commonwealth v.*

*Dessus,* 262 Pa. Super. Ct. 443, 396 A.2d 1254 (1978) (registered voters); *State v. Sheppard,* 350 So.2d 615 (La. 1977) (registered voters and licensed drivers); *State v. Gibbs,* 355 So.2d 1299 (La. 1978) (registered voters and volunteers); *State v. Price,* 272 S.E.2d 103 (N.C. 1980) (registered voters and property taxpayers); *State v. Stewart,* 175 Mont. 286, 573 P.2d 1138 (1977) (county taxpayers); *State v. Sanders,* 225 Kan. 147, 587 P.2d 893 (1978) (personal property taxpayers and census rolls); *Smith v. State,* 364 So.2d 1 (Ala. Crim. App. 1978) (registered voters, city directory, telephone directory, tax assessor records, high school principals, clergy, and personnel managers of local industrial plants).

In an analogous claim of unconstitutional exclusion, the Supreme Court of Indiana recently held that it could not conclude that selecting petit jurors solely from a county's personal property tax list violated a defendant's Sixth Amendment rights when statistical data showed that 6 per cent of the county's population was black and that 25 per cent of those blacks earned below the poverty level. *Brown v. State,* 392 N.E.2d 476 (Ind. 1979). The court found that personal property tax list included names of automobile owners, and took judicial notice that "[i]t is common knowledge that automobiles costing very little money are owned, licensed and operated for transportation by persons from one end of the earnings spectrum to the other." 392 N.E.2d at 478. The court found the income statistics were not persuasive in establishing impermissible exclusion of a cognizable group from petit jury service.

We do not find any universally superior method or source of names for selecting a list of potential petit jurors which guarantees a fair cross-section of the community. Some lists may be more representative than others. None of the above mentioned lists absolutely guarantees a fair cross-section of the community because none was complied strictly for the purpose of selecting petit jurors. *State ex rel. Whitman v. Fox, supra.* The question of constitutionally impermissible exclusion must be examined on a case-by-case basis considering the particular

selection method chosen and the size and characteristics of the excluded group and of the local population.

The appellants' final joint contention is that the trial court erred in refusing to conduct a full evidentiary hearing concerning the method of selecting the petit jury. They claim the trial court completely frustrated efforts to prepare an adequate record for appellate review of the constitutional issue by refusing testimony or affidavits of the jury commissioners and by refusing to allow the appellants' counsel to examine the master list from which the petit jury was drawn. We find this contention without merit.

The appellants rely heavily upon *Coleman v. Alabama,* 377 U.S. 129, 84 S.Ct. 1152, 12 L.Ed.2d 190 (1964). *Coleman* held that it was improper to refuse a defendant's offer to introduce evidence supporting a claim of long-standing, arbitrary and systematic exclusion of blacks from grand and petit juries in violation of his Fourteenth Amendment guarantees. The trial judge there granted a hearing on a motion for a new trial of Coleman's first-degree murder conviction. After allowing the defendant to call two circuit solicitors to testify as to the jury selection process, the trial judge sustained objections to all questions concerning systematic exclusion because the issue was not raised at or prior to trial. The Alabama Supreme Court reached the merits of the claim but affirmed the decision below, holding that the trial court had granted Coleman an opportunity on motion for new trial to introduce evidence of systematic exclusion. The Supreme Court reversed, stating that "[s]ince . . . the record shows that petitioner was not permitted to offer evidence to support his claim, the judgment of affirmance must fall." 377 U.S. at 133, 84 S.Ct. at 1154, 12 L.Ed.2d at 193.

The Court in *Coleman* relied upon *Carter v. Texas,* 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839 (1900), in which a Texas appeals court had refused to quash a murder indictment on the ground that the grand jury was selected in a racially discriminatory manner. The defendant in *Carter,* a black, had alleged racial exclusion in the grand jury selection process in a motion to quash the indictment at

the trial stage, but the trial court refused to hear any evidence to support the allegation. The Supreme Court reversed the judgment of the state appellate court on Fourteenth Amendment grounds.

We find that both *Coleman v. Alabama* and *Carter v. Texas, supra,* can be distinguished from the instant case. Both cases concerned allegations of long-standing exclusion of a cognizable group from jury service on the basis of race. The appellants here do not charge racial exclusion, nor do they contend any long-established exclusion in Logan County petit jury selection. The crucial distinction, however, is that both defendant Coleman and defendant Carter appeared to have access to evidence of exclusion and both were attempting to introduce such evidence to support their claims. Coleman's efforts to question the jury solicitors were denied on procedural grounds, despite the county's notorious practice of racial discrimination in jury selection. *See Carter v. Jury Commission of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). Carter offered to introduce witnesses to prove his allegations but the trial judge refused to hear any evidence on the issue. In both cases, the refusal to allow a full hearing on the issue of unconstitutional exclusion was clearly reversible error.

In contrast, the appellants here have offered to produce virtually no evidence to support their claim of a Sixth Amendment violation. Except for the figures quoted above concerning county population and personal property tax assessment, the appellants offered no facts in support of their contention that a cognizable group was excluded from the petit jury list. Their efforts to take affidavits from the jury commissioners, to compel their testimony, and to examine the master list of potential petit jurors are more akin to a "fishing expedition" than to a good faith offer to prove unconstitutional exclusion. We conclude, therefore, that the trial judge properly refused to grant the appellants' motion for a full evidentiary hearing to investigate the petit jury selection process because the appellants' allegations of unconstitutional exclusion were

not adequately supported by statistical or other documentation.[4]

## II

Appellant Whitman also contends the trial court impermissably influenced the jury's verdict. He cites as reversible error the trial court's response, after jury deliberations had begun, to a written question from the jury concerning the duties and potential criminal responsibility of two unindicted election clerks who also worked at Striker precinct on election day.[5]

---

[4] We find support in *Wade v. Yeager*, 377 F.2d 841 (3rd. Cir. 1962), *cert. denied*, 393 U.S. 893 (1968), a post-conviction habeas corpus proceeding, in which it was held that an unsubstantiated charge or racial discrimination does not warrant a full scale hearing on the manner of selecting grand and petit juries. *See also State v. Robinson*, 128 N.J. Super. 525, 529-530 (1974):

> Thus, in all the instant petitions defendants have alleged improper selection of grand and petit juries, as violative of due process as well as in some cases stating ineffective assistance of counsel as a ground for relief. But not one of the petitioners has provided a concrete basis for an evidentiary hearing on the matter by stating any supporting facts. To open a full-scale, evidentiary hearing on unsupported allegations would be opposed to the procedural rules, and as stated above, a disservice to the administration of justice. Constitutional rights should ordinarily not have to bow to mere rules of procedure. On the other hand, such challenges must be shown to rest on fact. Mere conclusions are inadequate. To hold otherwise would open the courts to an avalanche of frivolous applications, each of which would require hearings.

[5] The jury was apparently confused by the reference of defense counsel in closing argument to the unindicted election clerks. The jury's note read:

> "On the Certificate of Democrat Votes cast in Logan County, the 2 Clerks Louise Dingess and Ruth St. Clair—what responsibilities do they assume in signing this certificate.
> Can they be held responsible for the actual voting in the voting booth and what did they certify?"

The trial judge twice refused to answer that note and responded:

THE COURT: Ladies and gentlemen, I have received from the jury your note and the question of which you have asked thereupon and would indicate to you that it would not be proper for the court at this time and in this case involving defendant Whitman to advise you

The authorities cited by the appellant do not support this contention. In *State v. Burton,* 163 W.Va. 40, 254 S.E.2d 129 (1979), heavily relied upon by the appellant, we affirmed a rape conviction despite allegations that several of the judge's comments to the jury were prejudicial. In syllabus point 4 of *Burton, supra,* we held that

> [a] trial judge in a criminal case has a right to control the orderly process of a trial and may intervene into the trial procedure for such purposes, so long as such intervention does not operate to prejudice the defendant's case. With regard to evidence bearing on any material issue, including the credibility of witnesses, the trial judge should not intimate any opinion, as these matters are written within the exclusive province of the jury. 254 S.E.2d at 132.

Neither of the two additional cases cited by Whitman, *State v. McGee,* 160 W.Va. 1, 230 S.E.2d 832 (1976) and *State v. Hurst,* 11 W.Va. 54 (1877), supports his conclusion.

---

concerning any other responsibilities concerning any other voting officers.

In other words, I just simply can't. It would be err [sic] for me to answer that question for you. The court would further indicate to you that I don't think it is a matter which is germane to the issue here concerning the guilt or innocence of Mr. Whitman. I am going to excuse the jury at this time and ask you to be back at 6:30 to resume deliberations in this matter. . .

\* \* \*

THE COURT: Ladies and gentlemen, I am going to send you back to your jury room to deliberate. Let me just say one thing to you concerning your question which you proposed to me earlier. I don't want it to seem to the jury that I am being evasive or anything else. There are rules and regulations we must follow concerning jury matters and my answer to you was based on those. It would not be proper for me to discuss with you at this time those questions which were brought up in your note. And, by the same token, I don't think that that would be proper consideration for the jury in this particular case.

So, with that in mind, I will ask the bailiff to take you into your jury room and we'll get the verdict forms and exhibits and hand them in to you.

In the instant case, the judge's comments were completely unrelated to the issues for jury consideration. The duties and possible criminal culpability of the election clerks was clearly not a material issue at appellant Whitman's trial. Defense counsel's reference to the election clerks in closing argument was irrelevant to the jury's fact-finding mission and the trial judge's comments correctly removed such extraneous questions from the jury's consideration. In no way did his actions or comments prejudice the appellants' defense. We conclude, therefore, that the trial court's comments did not impermissibly influence the jury's verdict.

Appellant Whitman also claims that the trial court impermissibly coerced the jury verdict convicting him. He argues that it was reversible error for the trial court, after being informed that the jury could not reach a verdict, to send the jury back for further deliberation, thereby coercing the jury verdict. The record shows that after the jury had deliberated for one and one-half hours, the trial court recalled them:

THE COURT: Ladies and gentlemen, have you reached a verdict in the case?

THE FOREMAN: We were unable to reach a verdict, sir.

THE COURT: The jury has not reached a verdict then. All right, this case has taken up about two days of trial time up to this point and the jury has only deliberated about one and a half hours. I think it's a very serious case and this jury is, of course, as competent a jury as any other jury to decide the case and I don't think it has been given sufficient consideration at this time.

So, I am going to ask you to go back to your jury room and to continue to deliberate in the case bearing in mind the instructions which I gave you pertaining to your jury service. The jury should go back with the bailiff.

THE FOREMAN: Your Honor, I think it's impossible for us to reach a decision.

THE COURT: Well, I don't want to indicate to the jury that I am going to keep them out until they reach a decision because that I am not going to do. But by the same token, I think the jury and each and every juror should consider of his own feelings in regard to this matter and I don't think that a trial which has taken two days can be disposed of by virtue of a hung jury finding with an hour and a half deliberation.

So, I would ask you to go back, ladies and gentlemen, and continue to deliberate.

* * *

Ladies and gentlemen, it is my understanding you have not reached a verdict, is that correct, Mr. Foreman?

THE FOREMAN: That is correct.

THE COURT: I would ask you to listen very closely to this instruction that I am about to give you. It is the duty of the jury in this case to reach a verdict on the issues, if at all possible. In the event that this jury cannot reach a verdict, this court would have to declare a mistrial and the case would have to be tried again before another jury of 12.

I see no reason why you jurors are not as competent, are not as able, nor as likely to decide the disputed issues of fact in this case and decide the right as the next jury that would be called to determine such issues. I do not want you to understand by what I say that you are going to be made to agree or that you are going to be kept out until you do agree. I do want you to understand that it is your duty to make an honest and sincere attempt to arrive at a verdict.

Jurors should not be obstinate. They should be open minded. They should listen to the arguments of others and talk matters over freely and fairly and make an honest effort, as fair minded men and women, to come to a conclusion on all of the issues presented to them so long as each juror can do so without sacrificing his or her own convictions.

> I am going to direct the bailiff to take you again to your jury room for further deliberations. Because of the lateness of the hour and because you've been here on this case all day and part of this evening, I will, if the jury desires after talking it over, excuse you until tomorrow at which time you may resume your deliberations or allow you to continue to deliberate this evening. I will ask the jury to bear in mind this court's instructions and to go with the bailiff to their jury room and continue to consider the issues presented in this case.

Whether a trial court's instructions constitute improper coercion of a verdict necessarily depends upon the facts and circumstances of the particular case and cannot be determined by any general or definite rule. *Janssen v. Carolina Lumber Co.*, 137 W.Va. 561, 73 S.E.2d 12 (1952). It is generally held that when a jury is unable to agree on a verdict, it is within the trial court's discretion to urge an earnest effort to agree, so long as the jurors are free to act without any form of coercion by the trial court. 89 C.J.S. *Trial* § 481(a) (1955); 76 Am. Jur.2d *Trial* § 1054 (1975). The trial court must carefully instruct the jurors not to give up their conscientious convictions merely for the sake of achieving a verdict, and must scrupulously avoid expressing any opinion as to how the case should be decided. The trial court decision to so instruct the jury must neither encourage disagreement nor coerce agreement, *State v. Taft*, 144 W.Va. 704, 110 S.E.2d 727 (1959), but should foster the jury's fair and open-minded debate.

The trial court's instructions in the instant case constituted a fair and reasonable effort to stimulate continued deliberation. The jury had deliberated only one and one-half hours prior to their recall and the giving of the supplemental instructions. The trial court clearly felt more deliberation was appropriate, and we find no abuse of discretion in his decision to so instruct the jury.

More importantly, the instructions given were not coercive. The trial court did not threaten to keep the jury out until they reached a verdict. He did not chastise them, but, rather, asked them not to be obstinate and pointed

out the importance of the case and the problems resulting from a hung jury. The trial court did not go so far as to instruct the jury on the second or third elements of the much harsher "dynamite" or "Allen" charge, approved by the Supreme Court in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The trial court carefully urged the jurors to be open-minded, to conduct free and fair discussion of the issues, and to reach a decision only "so long as each juror can do so without sacrificing his or her own conviction."

The instant case is readily distinguished from our leading cases on this point of law. In *Lennox v. White*, 133 W.Va. 1, 54 S.E.2d 8 (1949), we reversed a judgment for trespass on the case, holding in syllabus point 3 of that opinion that "[i]t is error for a trial judge to inquire as to the numerical vote of a jury and, after being informed that their vote stands eleven to one, to advise them that it is their duty to arrive at a verdict if humanly possible consistent with right and justice." Here the trial court neither requested nor received information as to the jury's division. The instructions were directed to the entire jury rather than to a minority as found coercive in *Lennox v. White, supra.*

In reversing a judgment for trespass on the case in *Janssen v. Carolina Lumber Co., supra,* we held in syllabus point 2

> Where a jury has reported that it is unable to agree, and the trial court addresses the jury urging a verdict, and uses language the effect of which would be to cause the minority to yield its views for the mere purpose of reaching an agreement, and an agreement is so reached, the verdict will be set aside.

The jury in *Janssen* had deliberated for four hours and had twice previously reported to the court their inability to agree before the trial court gave the coercive instruction. It read in part:

> And if you are alone or in a small minority, should you not ask yourself whether the thing you cling to as a conscientious conviction might in fact

be only a mistake in judgment, and whether the great majority of your fellow jurors, who took the same oath as you took as a juror, and who have consciences to satisfy the same as you have, might be right and you wrong. 137 W.Va. at 566, 73 S.E.2d at 15.

We relied upon *Janssen v. Carolina Lumber Co.*, *supra*, in *Levine v. Headlee*, 148 W.Va. 323, 134 S.E.2d 892 (1964), where we found reversible error in an instruction given after more than three and one-half hours of jury deliberation: "If after the three hours and one-half you have already deliberated, there is a majority and minority opinion among you, I urge those jurors differing from the majority to more closely scrutinize the evidence for the purpose of determining the correctness of their own opinions." 148 W.Va. at 330, 134 S.E.2d at 896.

In contrast to the instructions found coercive in *Janssen v. Carolina Lumber Co.*, *supra*, and *Levine v. Headlee*, *supra*, the instruction in the instant case neither mentioned majority and minority positions nor urged the minority to reconsider. We find the instant instruction more closely analogous to the following instruction we approved in syllabus point 2 of *State v. Taft*, 144 W.Va. 704, 110 S.E.2d 727 (1959).

If an instruction on the subject of the unanimity of the jury is granted by the court, it is proper in the same instruction to tell the jury that "the jury room is no place for pride of opinion or obstinacy, and it is the duty of the jurors to discuss the evidence in a spirit of fairness and candor with each other, and with open minds to give careful consideration to the views of their fellow jurors, and, if it can be done without a sacrifice of conscientious convictions, agree upon a verdict.

Accordingly, we conclude that the trial court's supplemental instruction to the jury did not coerce the verdict in this case.

Appellant Whitman's final assignment of error is that the trial court violated W.Va. Code § 56-6-19 (1966) by

giving the supplemental instruction for further deliberation orally, without first submitting a written copy of the instruction to counsel for both parties. In reliance upon *State v. Lindsey*, 160 W.Va. 284, 233 S.E.2d 734 (1977), the appellant claims that the trial court has a mandatory duty to submit in writing to counsel for both parties all instructions to be given to the jury. We find this contention without merit.

The relevant part of W.Va. Code § 56-6-19 reads: "The Court may, on its own motion, whether requested or not, in writing define to the jury the issues involved and instruct them on the law governing the case, but all such instructions shall first be submitted to counsel on each side with opportunity to object thereto." In syllabus point 2 of *Lennox v. White, supra*, the Court held:

> It is not reversible error under Code, 56-6-19, for a trial judge, after a case is submitted to a jury, to give it oral abstract advice concerning the proper and improper mental attitude for a juror to assume toward the matters submitted to be acted upon by him and not touching material matters in issue.

After finding a supplemental jury instruction coercive, the Court held that the trial court's oral submission of that instruction without previously submitting a written copy to both counsel did not violate W.Va. Code § 56-6-19.

> In this instance the trial court's instruction did not relate to "material matters in issue." It had to do entirely with the functioning of the jury in the performance of its duties. That being so, if there had been no error contained in its substance, we fail to see how it could have been prejudicial as a matter of form. We do not believe that it should be regarded as an instruction within the purview of Code, 56-6-19, though its subject matter is often covered in the form of instructions. If it had touched upon matters in controversy a different rule would be applied. 133 W.Va. at 7, 54 S.E.2d at 12.

Thus, under the holding of *Lennox, supra*, W.Va. Code § 56-6-19, requiring a trial court to submit in writing all

proposed jury instructions to counsel for both parties, applies only to instructions which relate to material issues in the case, and does not apply to a supplemental instruction to the jury to deliberate further. The instructions given in *State v. Lindsey, supra,* dealt with the substantive issue of the possibility of the defendant receiving parole. The supplemental instruction here dealt with no material matter in issue. We conclude, therefore, that the trial court did not err in giving the instruction orally.

## III

Appellant Hobbs contends that the trial court erred in refusing to poll the jury regarding possibly prejudicial pre-trial publicity, resulting from two newspaper articles that appeared on the eve of his trial. The day after appellant Whitman's conviction, a new jury was empanelled to try appellant Hobbs. That day, September 28, 1977, a Logan newspaper published a report of Whitman's conviction, noting that jury selection for appellant Hobbs' trial was to begin that morning with trial scheduled for the following day. On September 29, the day Hobbs' trial began, a Huntington newspaper published a report that the jury had been empanelled for Hobbs' case. Both newspaper stories related only the skeletal facts of the proceedings, containing no accounts of any prejudicial testimony at Whitman's trial or editorial comment on either case.

After the State presented its opening statement, the appellant requested the trial court poll the jury regarding pre-trial publicity, but the request was refused. The trial judge stated that he had admonished the jurors to avoid newspaper, radio or TV accounts of the case, "and in the absence of evidence to the contrary, the court must assume and does assume that the jury followed those instructions." After appellant Hobbs objected, the trial court took judicial notice of newspaper stories in question and allowed them to be introduced into the record.

"A trial court is vested with discretion in making the initial determination as to whether or not newspaper articles or other publicity brought to the attention of the

jury in the trial of a case results in prejudice." Syllabus point 2, *State v. Williams,* 168 W.Va. 19, 230 S.E.2d 742 (1976). The trial court must first determine if there is good reason to question the jurors, and then decide whether there is cause to grant a new trial. There are no hard and fast rules in determining whether newspaper articles or publicity read by or brought to the attention of the jury is prejudicial, but each case must be decided upon its facts and circumstances. *State v. Williams, supra.* We will reverse a trial court's refusal to poll the jury for prejudicial publicity only for abuse of discretion.

In the instant case, the record reveals no finding by the trial court that the newspaper articles were not prejudicial.[6] Appellant Hobbs offered no evidence to support his claim of prejudice. There is no indication that any of the jurors read either of the stories or that any had been influenced by them. Hobbs did not attempt to demonstrate the actual or probable prejudicial tendency of any of the language employed in either article. Our examination reveals nothing inherently prejudicial about the newspaper articles.

Hobbs relies primarily upon *State v. Williams, supra,* in which we reversed a conviction for transferring drugs because the jury foreman read and informed the other jurors of a prejudicial newspaper article published during the jury's deliberations. We found inadequate the trial court's questioning of the jury for prejudice and reversed its denial of Williams' motion for a new trial.

*State v. Williams, supra,* is distinguishable from the instant claim. There the article, though not dealing directly with Williams, was clearly prejudicial, and its contents were relayed to the jury by the foreman, who favored conviction. Here the articles are not inherently prejudi-

---

[6] The record does indicate, however, that the trial court was already familiar with the newspaper articles and with the appellant's claim before the issue was addressed in court. It would be mere speculation for us to conclude that the trial court *in camera* found them not prejudicial. We must confine our analysis to the record as we find it.

cial, nor is there evidence that any juror read or was informed of them. In *State v. Williams,* the prejudicial publicity took place during the jury's out-of-court deliberation, a crucial time in the proceedings, while here the newspaper articles were published before any evidence had been presented and the trial court had adequate supervisory powers over the remainder of the trial. Finally, counsel for Williams demonstrated there was a probability of prejudice, while counsel for Hobbs merely brought to the trial court's attention the newspaper articles, and asked to place a copy of each in the record without explaining how either or both prejudiced the defendant.

In *State v. Williams, supra,* we enumerated a list of factors to be considered in determining whether a newspaper article may have prejudiced a jury in its deliberations, including the content and context of the article and the manner in which the publicity is brought to the attention of the jury. While these factors apply to claims of prejudicial publicity jury deliberation, we believe that they also offer guidance in determining whether a trial court has abused its discretion in refusing to poll the jury at an earlier stage of the proceeding to investigate a claim of prejudicial publicity in light of the peculiar facts and circumstances of the case.

Here the content of the newspaper articles was not inherently prejudicial, nor was the discussion of appellant Hobbs prejudicial in the context of the two wholly factual, non-editorial articles. Further, the lack of any evidence tending to show that either article was brought to the attention of any juror lends additional support to the trial court's decision not to poll the jury.

"To establish that he was denied a fair and impartial trial, the defendant does not have to affirmatively show that there was actual prejudice resulting from the contents of the newspaper article or the jury's exposure to it, but rather there was probable prejudice." Syllabus point 3, *State v. Williams, supra.* Appellant Hobbs has not met his burden of showing probable prejudice. In the absence of other evidence of actual or probable prejudice from a

newspaper article which is not inherently prejudicial, we will not find an abuse of discretion in the trial court's refusal to poll the jury on the question of prejudicial publicity. *See, Gordon v. United States*, 438 F.2d 858 (5th Cir.), *cert. denied*, 404 U.S. 828 (1971).

Our decision is in accord with six federal Courts of Appeal which have addressed this issue. *United States v. Goodman*, 605 F.2d 870 (5th Cir. 1979); *United States v. Williams*, 604 F.2d 1102 (8th Cir. 1979); *United States v. Gigax*, 605 F.2d 507 (10th Cir. 1979); *United States v. Armocida*, 515 F.2d 29 (3rd Cir. 1975); *United States v. Hankish*, 502 F.2d 71 (4th Cir. 1974); *Luallen v. Neil*, 453 F.2d 428 (6th Cir. 1971). Our research reveals that the highest courts of at least eight states have concurred with this view. *See Brown v. State*, 601 P.2d 221 (Alaska 1979); *State v. Keliiholokai*, 58 Hawaii 356, 569 P.2d 891 (1977); *Bruce v. State*, 268 Ind. 180, 375 N.E.2d 1042 (1978); *State v. Bazinet*, 372 A.2d 1036 (Me. 1977); *State v. Kirkland*, 602 P.2d 586 (Mont. 1979); *State v. Cline*, 405 A.2d 1192 (R.I. 1979); *State v. Salters*, 273 S.C. 483, 257 S.E.2d 502 (1979); *Waye v. Commonwealth*, 219 Va. 683, 251 S.E.2d 202 (1979). *See also, Abbott v. State*, 334 So.2d 642 (Fla. Dist. Ct. App. 1976). Consequently, we conclude that the trial court did not err in refusing to poll the jury on the possibility of prejudicial pre-trial publicity.

For the reasons set forth above, we conclude that the Circuit Court of Logan County committed no reversible error in the conduct of the proceedings below and accordingly, we affirm the judgments of conviction entered by that court.

*Affirmed.*