631 S.E.2d 586

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Marvin Steve MILLS, Defendant Below, Appellant.**

**No. 32551.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 2005.

Decided Nov. 17, 2005.

Kristen L. Keller, Chief Deputy Prosecuting Attorney, Beckley, Attorney for the Appellee.

Gregory A. Ayers, Wendy A. Campbell, Public Defender Corporation, Charleston, Attorneys for the Appellant.

PER CURIAM:

This is an appeal by Mr. Marvin Mills (hereinafter "Appellant") from a conviction in the Circuit Court of Berkeley County of first-degree murder without the recommendation of mercy. The Appellant contends that the lower court erred on several issues: by re-

fusing to strike two jurors for cause; by denying a mistrial after media attended a jury view of the crime scene; by refusing to individually voir dire jurors regarding the impact of media attention; by allowing the State to introduce prejudicial testimony regarding the Appellant's character; and by denying a mistrial when the prosecutor made certain allegedly prejudicial comments during closing argument. Upon thorough review of the record, briefs, and applicable precedent, this Court affirms the Appellant's conviction.

### I. Factual and Procedural History

The Appellant admits that he fatally shot Mrs. Pamela Cabe on September 8, 1999, at her employment location, Richmond Cleaners, in Beckley, West Virginia. The Appellant shot Mrs. Cabe with a .38–caliber pistol once in the back and once in the head, and Mrs. Cabe was deceased by the time paramedics arrived at the scene. The Appellant was ultimately charged with first degree murder, and evidence presented at the Appellant's first trial indicated that subsequent to the shooting, the Appellant had walked across the street to smoke a cigarette as emergency vehicles arrived.

The Appellant explained to police officers that he had gone to Richmond Cleaners to talk with Mrs. Cabe concerning a dispute between Mrs. Cabe's son and the Appellant's daughter regarding custody of that couple's child. According to the Appellant, he had intended only to scare Mrs. Cabe, and he had not gone to the location with the intent to fatally wound her.

During the Appellant's first trial, the defense attempted to show that the Appellant had acted without premeditation or deliberation. The State, however, presented evidence indicating that the Appellant had premeditated the murder. The Appellant had been informed of the results of a custody hearing involving the mutual grandchild of the Appellant and Mrs. Cabe earlier that day. After learning of the custody hearing results, the Appellant took his .38–caliber pistol, drove seven miles to Richmond Clean-

ers, walked into the business, took the gun out of a manilla envelope, and shot four bullets, hitting Mrs. Cabe twice.[1]

Subsequent to the Appellant's first trial, a jury found the Appellant guilty of first-degree murder without the recommendation of mercy. The Appellant appealed that conviction to this Court. On June 24, 2002, this Court reversed the Appellant's first conviction. *See State v. Mills*, 211 W.Va. 532, 566 S.E.2d 891 (2002). This Court found reversible error in the lower court's denial of a motion to strike a prospective juror for cause after that juror had stated that his acquaintance with an arresting officer would prevent him from acting impartially. Further, this Court scrutinized the direct examination testimony of a detective, indicating that the Appellant had expressed anger at the arraignment and at an in-camera hearing but had failed to express remorse or sorrow over killing Mrs. Cabe. This Court found that such testimony served as an improper reminder of the Appellant's failure to testify at trial. Additionally, this Court found reversible error in the prosecutor's comment during closing argument, indicating that there were other cases in which a murderer himself had apologized. The Court concluded that the prosecutor's statement was also an improper reference to the Appellant's decision not to testify at trial. *Mills*, 211 W.Va. at 534, 566 S.E.2d at 905.

Based upon the errors in the original trial, the Appellant was retried by the lower court, and on November 7, 2003, the Appellant was again convicted of first degree murder without the recommendation of mercy. Based upon the existence of specific standards of review applicable to each of the issues raised as assignments of error in this case, those specific standards of review will be discussed as each assignment of error is analyzed.

### II. Discussion

#### A. Failure to Strike Jurors for Cause

■ The Appellant contends that the lower court abused its discretion in declining to

---

1. The Appellant did not testify at trial but did present the testimony of his daughter and two neighbors, indicating that the Appellant main- tained a loving relationship with his granddaugh- ter, the subject of the custody dispute.

strike two jurors for cause and thereby required defense counsel to utilize two peremptory strikes to remove prospective jurors. The prospective jurors were informed that the sentence for first degree murder is life in prison. They were thereafter asked whether they would be able to consider a life sentence with the possibility of parole eligibility after fifteen years if they found the Appellant guilty of first degree murder. Two prospective jurors, Ms. Haga and Ms. George, had answered that question in the negative. When questioned further regarding that issue, Ms. Haga indicated that she did not personally know the legal consequences of a mercy recommendation and would follow the instructions of the judge in making her determinations. She specified that she would consider the options provided to her by the court, including eligibility for parole. In refusing to strike Ms. Haga for cause, the lower court explained that the prospective juror had initially been confused by the questions but that she was "affirmative in her statement..." that she "would consider mercy[.]"

Further inquiry after prospective juror Ms. George revealed that she would consider mercy "if there were circumstances that gave that right." She specified that she would consider parole eligibility if so instructed by the court and that she would listen to all the evidence prior to making any decision. The lower court refused to strike Ms. George for cause, reasoning that she indicated that she would consider mercy if given the instruction to consider it.

■ The standard of review to be employed by this Court in such matters was clearly articulated in syllabus point six of *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996), as follows:

The challenging party bears the burden of persuading the trial court that the juror is partial and subject to being excused for caused [sic]. An appellate court only should interfere with a trial court's discretionary ruling on a juror's qualification to serve because of bias only when it is left with a clear and definite impression that a prospective juror would be unable faithfully and impartially to apply the law.

As this Court stated in *Miller*, "[t]he trial court is in the best position to judge the sincerity of a juror's pledge to abide by the court's instructions; therefore, its assessment is entitled to great weight." 197 W.Va. at 606, 476 S.E.2d at 553 (citing *State v. Phillips*, 194 W.Va. 569, 590, 461 S.E.2d 75, 96) ("[g]iving deference to the trial court's determination, because it was able to observe the prospective jurors' demeanor and assess their credibility, it would be most difficult for us to state conclusively on this record that the trial court abused its discretion").

On appeal, the State emphasizes that neither prospective juror was "unalterably opposed to making a recommendation of mercy in any circumstances in which a verdict of guilty is returned." *State v. Williams*, 172 W.Va. 295, 307, 305 S.E.2d 251, 263–64 (1983). The State further points out that the questionnaire did not properly inquire of the "willingness of the prospective jurors to exercise their discretion to determine the penalty," as required by *Williams*. 172 W.Va. at 307, 305 S.E.2d at 264.

■ Elaborating upon the standards articulated in the above opinions, this Court explained as follows in syllabus point three of *O'Dell v. Miller*, 211 W.Va. 285, 565 S.E.2d 407 (2002).

When considering whether to excuse a prospective juror for cause, a trial court is required to consider the totality of the circumstances and grounds relating to a potential request to excuse a prospective juror, to make a full inquiry to examine those circumstances and to resolve any doubts in favor of excusing the juror.

Syllabus point four continued as follows: "If a prospective juror makes an inconclusive or vague statement during *voir dire* reflecting or indicating the possibility of a disqualifying bias or prejudice, further probing into the facts and background related to such bias or prejudice is required." However, syllabus point five clarified that "[o]nce a prospective juror has made a clear statement during *voir dire* reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent

**34**

questioning, later retractions, or promises to be fair."

The remarks at issue in the present case did, at first blush, appear to create an issue of possible bias against the potential for a recommendation of mercy in a first degree murder case. In the opinion of this Court, however, the initial responses to the questionnaire were not so clearly disqualifying as to prevent attempts at explanation, as contemplated by syllabus point five of *O'Dell*. On the contrary, the remarks appeared to have been the result of confusion on the part of the jurors caused by the questionnaire itself and were of the nature contemplated by this Court in syllabus point four of *O'Dell*, to the extent that the responses were inconclusive or vague and permitted additional inquiry into the basis for the statements. The lower court, by engaging in modest questioning, was able to ascertain the basis for the confusion.

Based upon this Court's review of this issue of prospective jurors and their alleged unwillingness to find the Appellant entitled to mercy, this Court finds no abuse of discretion by the lower court and affirms its decision with regard to these prospective jurors. Once the issues surrounding a potential recommendation of mercy were explained to the prospective jurors, their responses provided assurance to the court that they were indeed willing to follow the instructions of the court and to recommend mercy if the circumstances as proven at trial justified such a result. They demonstrated no bias or prejudice toward the accused, and the lower court's refusal to strike them for cause was not in error.

### B. Prosecutor's Closing Argument

■ The Appellant also asserts that statements made in the prosecutor's closing argument denied the Appellant due process of law and a fair trial. In initial closing argument, the State made no remarks concerning the jury's determination of whether to recommend mercy to the Appellant. In defense counsel's closing, however, defense counsel acknowledged that "I know I'm going to have to address the issue of mercy." Defense counsel further stated that "the final issue that might be decided today is whether there's going to be a recommendation of mercy...." Defense counsel continued: "Life in the penitentiary is a punishment. You are confined to a cell. Your freedom is completely restricted as to daily routine and regimen that is given you by the guards. There is the violence, the noise, the smells...." Defense counsel also told the jury that if the Appellant received a "life sentence with the possibility of parole, it's still very likely that he could die in prison."

Defense counsel also explained factors which a jury may consider in determining whether to recommend mercy, and the State contends that such recitation violated the mandates of West Virginia Code § 62–3–15 (1994) (Repl.Vol.2005),[2] which provides that the jury has discretion to make the determination of whether mercy should be recom-

---

2. West Virginia Code 62-3-15 provides as follows:

If a person indicted for murder be found by the jury guilty thereof, they shall in their verdict find whether he or she is guilty of murder of the first degree or second degree. If the *person indicted for murder is found by the jury* guilty thereof, and if the jury find in their verdict that he or she is guilty of murder of the first degree, or if a person indicted for murder pleads guilty of murder of the first degree, he or she shall be punished by imprisonment in the penitentiary for life, and he or she, notwithstanding the provisions of article twelve [§§ 66-12-1 et seq.], chapter sixty-two of this code, shall not be eligible for parole: Provided, That the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of said article twelve, except that, notwithstanding any other provision of this code to the contrary, such person shall not be eligible for parole until he or she has served fifteen years: Provided, however, That if the accused pleads guilty of murder of the first degree, the court may, in its discretion, provide that such person shall be eligible for parole in accordance with the provisions of said article twelve, and, if the court so provides, such person shall be eligible for parole in accordance with the provisions of said article twelve in the same manner and with like effect as if such person had been found guilty by the verdict of a jury and the jury had recommended mercy, except that, notwithstanding any provision of said article twelve or any other provision of this code to the contrary, such person shall not be eligible for parole until he or she has served fifteen years.

mended. In fact, this Court has expressed that "under both statutory and case law, the recommendation of mercy in a first degree murder case lies solely in the discretion of the jury." *State v. Triplett,* 187 W.Va. 760, 769, 421 S.E.2d 511, 520 (1992); *see also State v. Miller,* 178 W.Va. 618, 363 S.E.2d 504 (1987). Specifically, defense counsel informed the jury as follows:

> Now, it could be said and it's often said that somebody who's shown somebody no mercy does not deserve mercy themselves. It's said many times. I cannot—nobody can—say that what happened to Pam Cabe that day showed her any mercy, but that is not what you're here today to judge, and you know that. You know that you didn't swear an oath to make these determinations, to be a fair juror, in order to make a judgment like that. You ... took an oath to give a fair and honest verdict. . . .

Responding to defense counsel's closing argument concerning mercy to be shown toward the Appellant, the prosecutor stated as follows in her rebuttal closing argument:

> The defense lawyer made a remark about fairness, and we often think of fairness is that people get what they give, and he said that one might say that, since he showed his victim no mercy as he gunned her down, then perhaps he should get no mercy. But, if we were talking fairness— if we were talking about him getting what he gave—we would have the death penalty in the state of West Virginia, or perhaps. . . .

At that point, counsel for the defense objected to the prosecutor's remarks, and that objection was overruled. The prosecutor continued:

> We do not. We do not, so the defendant necessarily is getting mercy. He will get that life. Oh, I'm sure there are nasty smells in the prison, and I'm sure it's noisy in prison, but he'll be able to smell, and he'll be able to hear. And maybe their windows will be small, but he'll be able to look up at the sky, and his family can visit him.

The prosecutor again mentioned the death penalty and explained to the jury, over objection by defense counsel, that the legislature of this State "has decided that first degree intentional deliberate premeditated murder will not result in the death penalty. . . ." The prosecutor explained that only life imprisonment is to be imposed and that it is within the jury's discretion to grant mercy if it sees fit.

On appeal, the State asserts that the prosecutor's remarks accurately stated the penalty for first degree murder in this State and properly rebutted the defense counsel's statements concerning mercy. The State maintains that there is nothing inappropriate about pointing out that although the Appellant may have to endure what defense counsel characterized as nasty smells or limited sights in prison, he would indeed get to continue to live.

 In syllabus point six of *State v. Sugg,* 193 W.Va. 388, 456 S.E.2d 469 (1995) this Court articulated the factors to be examined when analyzing an alleged prejudicial prosecutorial remark, as follows:

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Syllabus point five of *Sugg* clarified that not every improper prosecutorial remark will result in reversal of a conviction: "A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." In the present case, the State maintains that examination of the *Sugg* factors indicates that reversal is not required and that the prosecutor's arguments, even if deemed improper, did not result in "manifest injustice."

In *State v. Graham,* 208 W.Va. 463, 541 S.E.2d 341 (2000), this Court also addressed

the principles by which prosecutorial comments must be judged. This Court stated as follows:

In reviewing allegedly improper comments made by a prosecutor during closing argument, we are mindful that "[c]ounsel necessarily have great latitude in the argument of a case," *State v. Clifford*, 58 W.Va. 681, 687, 52 S.E. 864, 866 (1906) (citation omitted), and that "[u]ndue restriction should not be placed on a prosecuting attorney in his argument to the jury." *State v. Davis*, 139 W.Va. 645, 653, 81 S.E.2d 95, 101 (1954), *overruled, in part, on other grounds, State v. Bragg*, 140 W.Va. 585, 87 S.E.2d 689 (1955). Accordingly, "[t]he discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Syllabus Point 3, *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927).

208 W.Va. at 468, 541 S.E.2d at 346.

The prosecutor's comments in the present case were extremely unconventional to the extent that the prosecutor's intent was apparently to equate "life without mercy" to "mercy." In other words, because the Appellant was not being subjected to the death penalty, mercy had already been tendered. That is a drastic mischaracterization of the concept of mercy and was clearly designed to persuade the jury that the Appellant was already getting one form of mercy and should not be granted additional mercy by the jury. We therefore find that the prosecutor's remarks in the present case were clearly in error. Such a reference to the absence of the death penalty as constituting mercy has no place in the closing arguments of any prosecutor and should not be repeated.

■ However, while this Court might reverse a conviction on this ground in some circumstances, we find that within the particular circumstances of the present case, no clear prejudice or manifest injustice resulted from the prosecutor's remarks. This Court has consistently recognized that not all im-

proper prosecutorial comments will result in a reversal of a conviction. *Sugg*, 193 W.Va. at 405, 456 S.E.2d at 486. An examination of the factors identified in *Sugg* reveals that the conviction in the case should not be reversed. The remarks were of limited duration and were not extensive or overly coercive toward the jury. There is no indication that the comments were placed before the jury to divert the jury's attention to extraneous matters. Finally, syllabus point five of *Sugg*, quoted above, instructs that remarks "which do not clearly prejudice the accused or result in manifest injustice" will not trigger reversal of a conviction. 193 W.Va. at 393, 456 S.E.2d at 474. We find no clear prejudice or manifest injustice for the reasons discussed above, as well as the fact that this was actually the second jury that reviewed the evidence against the Appellant and convicted him without the recommendation of mercy. The lower court also found that these prosecutorial remarks were, to at least some extent, invited by defense counsel's statements. Under the totality of circumstances, we find that the jury would have come to the conclusion of guilty without the recommendation of mercy even if counsel had not made these ill-advised statements regarding the death penalty and mercy.

## C. Media Participation in Jury View

■ The Appellant also asserts that the lower court committed reversible error by denying a motion for a mistrial and a poll of the jury after the media appeared at the jury view of the crime scene and published a photograph in the newspaper showing the backs of some jurors as they walked near the crime scene. Rule 8.07 of the West Virginia Trial Court Rules allows the news media to be present at judicial proceedings open to the public and requires that news media personnel and equipment be situated in a manner which is not disruptive of the proceedings. However, Rule 8.10 of the Trial Court Rules prohibits the publishing of any material in which a juror's face is show or a juror's identity is otherwise discernable, unless there is prior approval by a judge.

When defense counsel moved for a mistrial based upon media presence at the crime

scene, the court denied that motion, explaining as follows:

> There has been no showing in my mind of prejudice, no showing of a taint... to the jury, and I do not believe that the presence of camera folk in this courtroom or at the jury (view) scene is sufficient to warrant my granting a mistrial in this case.
>
> As the jurors are aware that those camera folks has an interest and were out at the jury view, they are aware, under the rules, that they're in the courtroom. So they understand that the media is interested in the case, and the First Amendment clearly requires that we make allowance for the presentation of public information.
>
> I don't believe there's been sufficient showing of ... taint or prejudice, and I'm going to deny your motion....

When the jury photograph, showing only the backs of the jurors, appeared in the local newspaper, defense counsel asked the lower court to poll the jury regarding the impact of the media presence at the jury view. The lower court did not permit the polling of the jury, explaining as follows:

> [T]here is in the law a presumption of regularity with regard to the instructions I've given the jury. And I've instructed the jury not to read the newspaper, not to listen to the radio and not to watch television. That being the case, I can presume, in the absence of evidence to the contrary, that they've not seen that picture and that they're not aware that that picture is in there.
>
> Number two, I've looked at the newspaper again, and I personally can't identify any of the jurors although I know some of them.... But there is no indication that any of these jurors have been affected by this.

The State asserts that the lower court properly determined that members of the media were not within the crime scene and that their presence was inconsequential. The State also contends that the lower court correctly decided not to poll the jury concerning the newspaper photograph since there was no reason to believe that the jurors had seen the photograph or otherwise been affected by its presence in the newspaper.

The record reveals that the media did not actually enter the crime scene. The press coverage was conducted outside the murder scene, in a public area outside the dry cleaner business in which the victim was shot. There is nothing in the record to support a claim that the jury was in any manner annoyed, distracted, or confused due to the presence of the press outside the crime scene.

■ This Court has indicated on numerous occasions that the decision to declare a mistrial is a matter within the sound discretion of the trial court. *Williams,* 172 W.Va. at 304, 305 S.E.2d at 260 (citing *State v. Craft,* 131 W.Va. 195, 47 S.E.2d 681 (1948)). In fact, "[a] trial court is empowered to exercise this discretion only when there is a 'manifest necessity' for discharging the jury before it has rendered its verdict." *Id.*

■ In syllabus point four of *Williams,* this Court explained as follows: "A defendant who seeks a mistrial on the ground that the jury has been improperly influenced by prejudicial publicity disseminated during trial must make some showing to the trial court at the time the motion is tendered that the jurors have in fact been exposed to such publicity." In syllabus point five of *Williams,* this Court continued as follows: "If it is determined that publicity disseminated by the media during trial raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material." This Court ultimately determined in *Williams* that the article published by the media was possibly prejudicial to the defendant. However, this Court stated that "[w]e do not think that prejudice to the accused can be presumed from the mere opportunity during trial to read or to hear about objectionable media reports." 172 W.Va. at 304, 305 S.E.2d at 261.

■ Following the standards articulated in *Williams,* it does not appear in the present case that the media presence raised "ser-

ious questions of possible prejudice." On the contrary, we agree with the finding of the lower court that such presence, under these particular circumstances, was inconsequential. The myriad of cases dealing with the effects of media attention upon a jury concentrate upon *prejudicial* publicity. It is *prejudicial* publicity, something which could cause the jurors to have an unfavorable impression of a defendant, which raises questions of effects upon the jury. In *State v. Hobbs*, 168 W.Va. 13, 282 S.E.2d 258 (1981), for instance, this Court found that probable prejudice did not exist since the publicity at issue was not inherently prejudicial. "In the absence of other evidence of actual or probable prejudice from a newspaper article which is not inherently prejudicial, we will not find an abuse of discretion in the trial court's refusal to poll the jury on the question of prejudicial publicity." 168 W.Va. at 43–44, 282 S.E.2d at 275.

In *State v. Nixon*, 178 W.Va. 338, 359 S.E.2d 566 (1987), this Court explained as follows:

> While it is true that the influence of publicity may be of such a nature as to require a mistrial, there are no hard and fast rules to be followed in making such a determination. *Williams I*, 160 W.Va. 19, 230 S.E.2d 742. Each case turns on its individual circumstances such as the content and context of the publicity and how the jury is exposed to the publicity. *Id.*

178 W.Va. at 341, 359 S.E.2d at 569. As the Kentucky court recognized in *Lucas v. Commonwealth*, 840 S.W.2d 212, 215 (Ky.App. 1992), "[w]e live in a time and society where the news media reports freely. It is unrealistic to expect to completely sanitize a trial and jury. . . ."

In the present case, we conclude that the lower court was not required to question the jurors about exposure to the media, either through media attention at the jury view of the crime scene or through publication of a photograph of that jury view in the newspaper. We therefore find no abuse of discretion in failing to order a jury poll to inquire about the effects of this media presence, and we find no abuse of discretion in failing to declare a mistrial.

### D. Testimony Regarding Victim's Fear of the Appellant

The Appellant further claims that the lower court abused its discretion by permitting a state's witness to testify that the victim was afraid of the Appellant. The Appellant contends that such testimony was prejudicial to the Appellant and in violation of West Virginia Rule of Evidence 404(a)(1),[3] prohibiting the introduction of character evidence for the purpose of proving that the Appellant acted in conformity therewith. The State had asked the victim's daughter whether the victim had expressed a state of mind concerning the Appellant. The daughter then stated that her mother was "very much afraid of Marvin Mills." Defense counsel objected, and the State responded that the testimony was being offered to show the victim's state of mind and rebut the Appellant's statement that the victim smirked at him.

On appeal to this Court, the State contends that evidence regarding the victim's expression of her state of mind was not Rule 404 evidence of the Appellant's character; rather, it was relevant evidence submitted to show the victim's state of mind and the absence of provocation by the victim. By the time of the daughter's testimony, the lower court had already ruled that the Appellant's tape-recorded statement to police would be admissible. In that statement, the Appellant had indicated that he had gone to the victim's place of business to scare her and that she had smirked at him. Further, the defense had also attempted to characterize the victim as a controlling, difficult woman. The State maintains that it was entitled to submit evidence regarding the victim's fear of the Appellant.

---

3. West Virginia Rule of Evidence 404(a)(1) provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion," except:

(1) Character of Accused.—Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same. . . .

■ As this Court stated in syllabus point seven of *State v. Miller*, 175 W.Va. 616, 336 S.E.2d 910 (1985), " ' "Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *State v. Louk*, 171 W.Va. 639, 301 S.E.2d 596, 599 (1983).' Syllabus Point 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983)."

The State argues that expression of the victim's personal emotion regarding the Appellant, i.e., fear, does not constitute "character evidence" and that even if it could be construed as character evidence, its submission does not violate Rule 404 because it was not offered for the purpose of proving that he acted in conformity therewith on the occasion on question. In *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court recognized that some statements concerning an individual simply do not fall within the definition of character evidence. "Quite clearly, evidence that the defendant was a 'Bible-reading man' and his religious beliefs are not admissible under the same rule because they simply do not concern a pertinent character trait." 194 W.Va. at 681, 461 S.E.2d at 187. In *State v. Marrs*, 180 W.Va. 693, 379 S.E.2d 497 (1989), this Court held that a defendant's reputation for not selling drugs did not pertain to a character trait. This Court explained in *Marrs:*

Unfortunately, neither the *Rules* nor any authoritative case offers a satisfactory definition of character. One learned commentator offers a definition that distinguishes "character" from "habit:"

Character is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness. Habit, in the present context, is more specific. It denotes one's regular response to a repeated question.

*McCormick On Evidence* § 195 (3rd ed.1984) at 574–75. This definition suggests that selling drugs is behavior that is too specific to be classified as a character trait.

180 W.Va. at 696, 379 S.E.2d at 500.[4]

■ Based upon our review of the issue of admissibility of evidence of the victim's fear of the Appellant, we agree with the contention of the State that even if the victim's fear of the Appellant could be construed as evidence of the Appellant's character, Rule 404 has not been violated since that evidence was not introduced to prove that the Appellant acted in conformity with that impression the victim had of him. Rule 404 apples only where evidence of a person's character is introduced to prove that he acted in conformity therewith.[5] We consequently find that the admissibility issue was properly within the discretion of the lower court, and we find no abuse of such discretion.

Affirmed.

---

4. Hearsay objections have also been made where evidence regarding a decedent's fear of an accused has been offered. In resolution of such cases, it has typically been held that such statements were not actually hearsay since they were not used to attempt to prove the truth of the matter asserted. *See People v. Starr*, 457 Mich. 490, 577 N.W.2d 673 (1998).

5. We also note that even if we had been convinced that admission of the "fear" evidence was in error, we would find that it was harmless error. *See* Syl. Pt. 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), cert. denied, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980) ("Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury").