No. 12-0301 - <u>State of West Virginia v. Bryan Maggard</u>

**FILED**

**October 7, 2013**
**released at 3:00 p.m.**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

LOUGHRY, Justice, dissenting:

The majority's startlingly terse opinion, which reverses the petitioner's conviction following a two-day jury trial, smacks of the worst kind of result-oriented jurisprudence. On the basis of cursory and incomplete legal analysis, the majority deprives the victim in this case of the justice which she deserves and suggests to similarly situated victims that review of the proceedings in their cases are not worthy of this Court's thorough and fully developed analysis. Specifically, the majority incorrectly concludes that there was an erroneous admission of evidence prohibited by West Virginia Rule of Evidence 404(a). More troubling, however, is the fact that the majority completely fails to undertake a harmless error analysis as to this perceived error. Had it done so, it would have reached the inescapable conclusion that the jury's verdict demonstrably renders any purported error utterly harmless. For these reasons, I dissent.

In the case at bar, the victim and the petitioner made plans to "hang out" and "maybe watch a movie" after the victim got off work with the express understanding "that nothing was going to happen sexually." The two met, as planned, and the victim gave the petitioner a ride home. Upon arriving at his place of residence, which was a room in the Marshall University Rugby House, the petitioner asked the victim if she

1

would come in and watch a movie. The victim testified that she "wanted to go home," but agreed to go in for "a little bit" because the petitioner was "very persistent." As part of this narrative testimony, upon direct examination, the prosecutor asked the victim why she was reluctant to accompany the petitioner into his room. The victim responded, "I heard how he is." Defense counsel offered a vague objection, asserting that this statement was "completely outside of the scope of what is going on here." The trial court overruled the objection and the victim briefly elaborated that the petitioner "just wants to get one thing from girls." With little analysis, the majority determines that this testimony was inadmissible Rule 404(a) evidence, which alone warrants reversal of the petitioner's conviction. I strongly disagree.

First, I do not believe that the testimony at issue constitutes Rule 404(a) evidence. Rule 404(a) provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion[.]" In *State v. Mills*, 219 W.Va. 28, 631 S.E.2d 586 (2005), we reiterated that character evidence prohibited by Rule 404(a) is limited to evidence which is offered "to prove that he acted in conformity therewith." Id. at 39, 631 S.E.2d at 597. In finding that evidence that the victim was afraid of the defendant was not inadmissible in *Mills*, we stated:

> Based upon our review of the issue of admissibility of evidence of the victim's fear of the [defendant], we agree with the contention of the State that even if the victim's fear

2

> of the [defendant] could be construed as evidence of the [defendant's] character, Rule 404 has not been violated since *that evidence was not introduced to prove that the [defendant] acted in conformity with that impression the victim had of him.* Rule 404 apples only where evidence of a person's character is introduced to prove that he acted in conformity therewith. We consequently find that the admissibility issue was properly within the discretion of the lower court, and we find no abuse of such discretion.

*Mills*, 219 W.Va. at 39, 631 S.E.2d at 597 (footnoted omitted) (emphasis added). Similarly, in the case at bar, the State argued that this testimony was not offered for the purpose of proving that the petitioner acted in conformity therewith. I agree. This conclusion is supported by the nature of the statement itself. The victim's testimony, fairly construed, suggests that the petitioner had a propensity for seeking out sexual encounters with women. This sort of *general* (and non-criminal) character trait does not equate to the crimes with which the petitioner was charged. The petitioner was charged with having *non-consensual* sexual contact with the victim; as such, the State would have no motivation to prove merely that the petitioner "only wanted one thing from girls" as it does nothing to prove an element of their case. Rather, if the State were theoretically attempting to introduce character evidence to prove that the petitioner acted "in conformity therewith," it would have elicited testimony that the petitioner was known for forcing himself on women. Said differently, the "character" or "trait" that the prosecution would have been attempting to prove that the petitioner acted in conformity with was having *non-consensual* sex with women. Nothing about the statement that the petitioner only "wanted one thing" suggests, in and of itself, that he was necessarily a

3

"sexual predator" (as the majority characterizes it) who engaged in sexual encounters with women *by force*.

The more reasonable construction of the statement is that it was provided as context for the victim's testimony as to why she was hesitant to go to the petitioner's room, why she felt it had been necessary to make certain that the petitioner understood that "nothing was going to happen sexually," and as further evidence of her subsequent lack of consent to the petitioner's unlawful conduct. Not only does the majority simply jump to the conclusion that such a statement was character evidence, it fails entirely to address the State's reasonable assertion that it was not offered to show conformity. Nowhere in its ten-page opinion does the majority dedicate so much as a sentence to discounting the alternative uses for this testimony before declaring it inadmissible. I believe this testimony was *not* Rule 404(a) evidence and, thus, the trial court did not abuse its discretion by admitting it at trial. Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998) ("A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard.").

Second, assuming, *arguendo*, that the majority is somehow correct in its conclusion that the questioned testimony is, in fact, Rule 404(a) evidence, it is patently obvious that any purported error was harmless. In an effort to reach its desired outcome, the majority blatantly omits altogether any such harmless error analysis from its

4

opinion—an analysis which this Court has repeatedly held is a *necessary* predicate to overturning a conviction. This Court has expressly held: "'A judgment will not be reversed because of the admission of improper or irrelevant evidence when it is clear that the verdict of the jury could not have been affected thereby.' Syllabus point 7, *Torrence v. Kusminsky*, 185 W.Va. 734, 408 S.E.2d 684 (1991)." Syl. Pt. 3, *State v. Swims,* 212 W.Va. 263, 569 S.E.2d 784 (2002). Moreover, in *State v. Blake*, 197 W.Va. 700, 705, 478 S.E.2d 550, 555 (1996), this Court explained that:

> Even when a trial court has abused its discretion by admitting or excluding evidence, *the conviction must be affirmed unless a defendant can meet his or her burden of demonstrating that substantial rights were affected by the error*. In other words, a conviction should not be reversed if we conclude the error was harmless or "unimportant in relation to everything else the jury considered on the issue in question." Instead, this Court will only overturn a conviction on evidentiary grounds if the error had a substantial influence over the jury.

(emphasis added) (citations omitted). *See also State v. McFarland,* 228 W.Va. 492, 505, 721 S.E.2d 62, 74 (2011) (Davis, J. and McHugh, J., dissenting) (observing that the majority's summary reversal of a sexual assault conviction on the basis of tenuous evidentiary grounds avoided harmless error analysis "because the majority wanted to reach a result that was not supported by the record").

With respect to harmless error, this Court has articulated the following test:

5

Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

Syl. Pt. 2, *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904 (1980); *see also Mills*, 219 W.Va. at 39 n.5, 631 S.E.2d at 597 n.5. (noting necessity of harmless error analysis even if 404(a) erroneously admitted).

The first step of the *Atkins* harmless error test requires the removal of the victim's testimony from the State's evidence in the case *sub judice* followed by an evaluation of the remaining evidence at trial to determine whether it was sufficient to support the jury's verdict. In considering the sufficiency of the evidence at trial, this Court has held:

An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

Syl. Pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). As this Court has further explained, "all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict." Syl. Pt. 2, in part, *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996).

Here, the evidence showed that the victim went with the petitioner into his room at the rugby house because he was "very persistent" in asking her to do so. The victim testified that the only consensual act once inside the petitioner's room was kissing. When asked whether she thought the kissing would lead to sex, she responded, "[n]o" because she had previously made it clear to the petitioner that they "were not going to have sex." Notwithstanding the victim's prior admonishments, she testified that the petitioner kept trying to "touch" her "crotch," that she "kept pushing his hand away," and that each time she pushed his hand away, she "told him '[n]o.'" The prosecutor questioned the victim regarding the petitioner's sexual assault of her as charged in Count One of the indictment, as follows:

> Q. And what happened after he kept trying to touch you?
> A. He ended up showing [sic] his hand down my pants.
> . . . .
> Q. What happened then?
> A. I tried to pull his hand away.
> Q. When he put his hand down there did his hand touch any part of your body?
> A. Yes.
> Q. What part?
> A. My vagina.
> Q. What part of his hand touched your vagina?

7

A. His fingers.

Q. Do you recall whether that was the outside of that area or actually inside your vaginal area?

A. Inside.

Q. And what was he doing when his finger was inside your vagina?

A. He had his finger in me.

. . . .

Q. Did you consent to him placing his finger in your vagina?

A. No.

Q. And how did you let him know at that particular point in time that you were not consenting?

A. Because I was trying to pull his hand away.

. . . .

Q. Okay. After he took his fingers out of you - - out of your vagina, what is the next thing that happened?

A. He jerked my shorts off of me.

. . . .

Q. What happened to your underwear?

A. They came off at the same time.

. . . .

Q. When he jerked off your shorts and your underwear, what did you do at that point.

A. Nothing, I had no time to react.

Q. Okay. You had no time to react. Any why is that?

A. Because he jumped on me right after.[1]

(Footnote added.).[2]  The victim also testified that she "was really scared"[3] and that she

waited until after the petitioner had "passed out" before leaving his room. The victim

---

[1]The victim's testimony regarding the sexual assault charged in Count Two of the indictment is equally disturbing. The victim testified that she "put [her] hands on his hips and was trying to push him off," that the petitioner "had his penis sitting on the top of [her] vagina," that she told him "'[n]o,' I don't want your penis there," and that he then "shoved" his penis into her vagina. She further testified that during the sexual assault, the petitioner held her arms down while he raped her. The victim testified that at some point during the penile sexual assault, she was able to twist her legs and move out from under the petitioner, who "jerked [her] back down by [her] legs[]" and put his penis back into her vagina. Reviewing the evidence at trial from the "coign of vantage" of the prosecution, I believe that the petitioner is incredibly fortunate not to have been convicted on both counts charged in the indictment. *See LaRock,* 196 W.Va. 294, 470 S.E.2d 613.

8

explained that she was crying so hard as she was driving home that she had to pull her car over to the side of the road. She then telephoned a friend, who took her to the emergency room.

Nurse King, who performed the "rape kit" on the victim at the hospital, testified that she "cried during most of the exam" and "sat in a ball with a sheet wrapped around her and cried with her eyes kind of cast down." Nurse King further testified that when she asked the victim questions, "tears would run down her face," that when she would leave the room and return, the victim would be crying again; and that the victim was "just visibly shaken." Nurse King also testified that she wrote down on the Sexual Assault Information Form that the victim was "crying intermittently, appears frightened, nervous, anxious, quiet and only speaks when spoken to."

Clearly, a reasonable jury could and did, in fact, conclude that the victim did not consent to the digital penetration charged in count one. Credibility determinations are for the jury, and a verdict "should be set aside only when the record *contains no evidence, regardless of how it is weighed*, from which the jury could find guilt beyond a reasonable doubt." Syl. Pt. 3, in part, *Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (emphasis added). After removing the scant testimony the majority found

---

[2]The transcript reflects that the victim cried throughout her trial testimony.

[3]The record reflects that the petitioner, a college rugby player, was much larger than the victim, who was five feet five inches tall and weighed 130 pounds.

inadmissible, the remaining evidence at trial was more than sufficient for the jury to find the petitioner guilty of sexually assaulting the victim beyond a reasonable doubt.

Having determined that the remaining evidence at trial was sufficient to convict, the final step of the *Atkins* harmless error test requires a determination of whether the testimony in question had any prejudicial effect on the jury. *Atkins*, 163 W.Va. 502, 261 S.E.2d 55. The majority cursorily states (in the context of assessing whether the error was preserved) that the testimony "*could have* prejudicially swayed the jury." (emphasis added). Not only is this an entirely baseless conclusion—which would have been revealed in the course of any substantive discussion thereof—but it is a complete misapplication of our standard of review. *Atkins* requires this Court to determine if the erroneous evidence "had any prejudicial effect on the jury." *Atkins*, 163 W.Va. 502, 261 S.E.2d 55. This does not permit the Court to engage in a conjectural and speculative analysis of the theoretical possibility of prejudice; it requires the Court to assess the verdict before it in the context of the inadmissible evidence.

Had the majority undertaken an analysis of the verdict along with the nature of the purportedly inadmissible evidence, it would necessarily have concluded that the jury's verdict objectively and demonstrably reveals no prejudice to the petitioner whatsoever. Had the subject testimony been prejudicial in any degree, the jury would have undoubtedly convicted the petitioner on *both* counts of second degree sexual assault as charged in the indictment. It defies logic to conclude that the jury inferred that the

10

petitioner was a sexual predator on the basis of the victim's "prejudicial" testimony for purposes of the digital penetration count, but discounted that same testimony in order to acquit him on the second charge.

Accordingly, even if the subject testimony were Rule 404(a) evidence, under the harmless error test as set forth in *Atkins*, this Court was required to uphold the petitioner's conviction. The majority's reversal of this conviction on the basis of flawed and inadequate analysis is nothing but a thinly-veiled substitution of its judgment for that of the jury. I am deeply concerned that this decision may send a message to victims that, despite a perpetrator receiving a fair trial and judgment by a twelve-member jury of his peers, the victim must still convince three members of this Court (sitting as a "super jury") that she demonstrated sufficient "earnest resistance"[4] to satisfy their sensibilities.

---

[4]West Virginia Code, 61-8B-4(a) [2010], states, in pertinent part, that:

> A person is guilty of sexual assault in the second degree when:
>
> (1) Such person engages in sexual intercourse or sexual intrusion with another person without the person's consent, and the lack of consent results from forcible compulsion[.]

For purposes of the second degree sexual assault, "forcible compulsion" means:

> (a) Physical force that overcomes *such earnest resistance as might reasonably be expected under the circumstances*; or
> (b) Threat or intimidation, expressed or implied, *placing a person in fear* of immediate death or bodily injury . . .[.]

W.Va. Code, 61-8B-1(1) [2010] (emphasis added).

For the forgoing reasons, I respectfully dissent.  I am authorized to state that Justice Workman joins in this dissent.